John HITZ, Appellant,

v.

PROPERTY INVESTMENTS, INC., a corporation, Terry Taylor, and Robert Dow, d/b/a Bob Dow and Associates, Appellees.

No. 83.

Supreme Court of Alaska.

Feb. 20, 1962.

19. Id. at 125.

Bailey E. Bell, of Bell, Sanders & Tallman, Anchorage, for appellant.

James Delaney, of Plummer & Delaney, Anchorage, for appellee Property Investments, Inc. Verne O. Martin, Anchorage, for appellee, Robert Dow.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

**NESBETT, Chief Justice.**

The main question intended to be raised on this appeal appears to be whether appellant was induced by fraud and misrepresentation to sign a contract for the sale of realty for a grossly inadequate consideration at a time when he was ill and not in full possession of his faculties.

Appellant's statement of points is so broadly worded that the only interpretation we can give to it is that the trial court is charged with error in just about everything that it undertook to do. The specification of errors simply repeats verbatim the statement of points and does not comply with Supreme Court Rule 11(a) (6). Appellant's argument is directed generally toward the question just stated and we shall consider the appeal on that basis.

On November 20, 1957 appellant entered into a written real estate broker's employment contract with appellee Robert Dow, listing lots 29 and 30 of Block 6–C Third Addition to the Townsite of Anchorage for sale for $20,000 on terms or $15,000 cash. On December 24, 1957, in a similar contract with Dow, the same property was listed for 60 days at a price of $12,000, with the notation "make offer" written into the terms. The latter listing provided that Dow was authorized to accept a deposit on the purchase price.

On January 17, 1958, at Dow's procurement, appellee Property Investments, Inc. signed an earnest money agreement offering to purchase the property for $9,500 and deposited $250 with Dow as earnest money. This offer called for payment of an additional $2,250 when the sale was closed, the remaining balance to be paid in monthly installments of $150. On January 17, 1958 Irene Doheny, one of Dow's agents, called at appellant's home with the earnest money agreement. Appellant signed the contract while sitting in the agent's automobile in front of his home.

A preliminary title report dated January 23, 1958 disclosed defects in appellant's title resulting from irregularities in probate proceedings had in 1952 when appellant purchased his deceased partner's interest in the property. Appellant's attorney (other than counsel on this appeal) commenced corrective proceedings to clear the title.

Early in May appellant's attorney advised Dow that she believed she would have the title cleared very soon without having to reopen the old probate proceedings. Accordingly, Dow's office caused the documents of sale to be prepared. On May 5, 1958 appellant met Dow in downtown Anchorage and signed the contract of sale apparently at an attorney's office. Shortly thereafter it became apparent to appellant's attorney that additional probate proceedings would be required before the title defects could be removed. Proceedings were instituted and appellant's title was finally cleared on March 3, 1959. Property Investments, Inc. then signed the contract and paid Dow $2,250, the balance of the agreed down payment. On March 10, 1959 appellant sued to cancel the contract of sale dated May 5, 1958 on the ground that appellees and their agents, by fraud and misrepresentation, induced appellant to sign the earnest money agreement and the contract of sale for a sum grossly disproportionate to the value of the property while appellant was handicapped by illness. Appellee, Property Investments, Inc. counterclaimed for specific performance and appellee Dow counterclaimed for his real estate commission of $570. The trial court found no fraud, misrepresentation or deceit on the part of either appellee; that the agreed purchase price was adequate; awarded Property In-

vestments, Inc. specific performance of its contract conditioned upon the tender by it to appellant of the full amount of the remaining balance due under the contract and awarded Dow judgment for his real estate commission in the sum of $570.

■ We have reviewed the record to determine whether there was evidence sufficient to support the trial court's findings.

The lots in question were originally purchased by appellant and his partner in 1944 for $400. Low swampy areas were filled and two buildings were moved onto the land and converted into a dwelling. After his partner's death in 1952, appellant purchased the partner's interest for $1,500. In December of 1956 or January of 1957 appellant was given a medical examination and advised that there was "nothing wrong" except that he needed rest. Appellant first listed the property here in question with appellee Dow in 1956 to be sold for $25,000. When this listing expired Dow refused to re-list it because the asking price was too high. It was then listed at separate times with two other realtors without sale before being again listed with Dow in November and December of 1957 as stated.

There is no evidence to indicate that appellant's listing of December 24, 1957 offering to sell for $12,000 and inviting offers, was anything but voluntary. Nor is there evidence to support his claim of fraud, misrepresentation and the innuendo of coercion as to this listing. His previous listings with Dow and other brokers at a higher asking price had not produced an offer.

On direct examination appellant admitted that he voluntarily made the "deal" to sell the property for $9,500, so that he could raise money to go to Mayo Clinic, referring obviously to his signing of the earnest money contract on January 17, 1958. Appellant's version of his signing of this contract is that Dow's agent, Irene Doheny, drove to his home in a station wagon; that he was sick and drunk and that she refused to bring the papers into his house for signature, but insisted that he sit with her in the station wagon and sign them. He stated that he believed the agent's reluctance to come into his house with the papers was because she knew he would read them and hold them for study if there was anything in them he didn't understand. Appellant was asked by his counsel at the trial:

"Q. And do you know until today, what you signed in the way of those papers.

"A. Right today I didn't know what I—what I was doing, no."

Appellant's deposition taken two and one-half months before trial was read into the record. As to this particular event his testimony was as follows:

"Q. [By counsel for appellee] This day you signed the paper agreeing to sell the property for $9,500, this was explained to you in Irene's car.

"A. Yes, that was Irene's car.

"Q. And you signed the paper.

"A. Yes.

"Q. And you knew what you were signing.

"A. Yes."

Appellant's testimony on deposition clearly indicates that he didn't want to read the papers as reading gave him a headache, but that she (referring to Irene Doheny) tried to read one of the papers to him. This testimony also clearly indicates that he was well aware that the only reason consummation of the sale was delayed so long was because he could not furnish marketable title in accordance with the terms of his contract. Appellant produced no evidence which would support his claims with respect to the signing of the contract of sale on May 5, 1958.

Appellant's health deteriorated during the summer of 1958 and by September he was hospitalized at the Elmendorf Air Force Base Hospital. While there his condition was diagnosed as cancer of the lung and he was sent to the Veterans Hospital

in Seattle where the affected lung was removed. Appellant returned to Anchorage in December of 1958 after making a good physical recovery. He testified that up until the time he was sent to Seattle in October of 1958 he would have accepted the down payment of $2,500 from Property Investments, Inc.'s contract but that after his return in December of 1958 he wanted to keep the property because appellees "didn't deal with me when I needed it * * *." Appellant argues that Dow no longer represented him after the papers he had signed on May 5, 1958 failed to bring about an early payment to him of the $2,500 down payment and that Dow was working for "somebody else not for me because he never give me no satisfaction of any kind".

There is no question but what appellant was in poor health and desired to push the sale through as soon as possible so he could use the down payment for medical treatment. On the other hand, it is undisputed that the only reason for the long delay was his own inability to furnish clear title. His attorney was engaged in attempting to remove the title defects and finally did remove them on March 3, 1959. In the meantime it appears that appellant obtained complete medical relief without the down payment by using the facilities of the Veterans Administration. Appellant's attempt to elicit medical testimony showing his state of mind at the time he agreed to sell the property produced nothing to support his claims.

Appellant's appraisal witness placed a value of $20,000 on the property in 1957 and a value of $48,500 in 1958. This witness also testified that the market in 1958 was very unsettled with much wild speculation. His valuations given on direct examination are unhelpful when considered in relation to his cross-examination. Dow, himself a qualified appraiser, testified that the property was worth no more than the sum offered, pointing out that it sloped away from the street on which it fronted; that the fill previously made would not support a foundation; that still additional fill was needed to bring it to street level and that it was crossed by a storm sewer.

From our study of the record we realize that appellant was a relatively uneducated man who had begun to suffer the ailments common to old age, and although he did not then know it, had a serious disease at the time he signed the broker's employment contract and the contract of sale. But the record also discloses that he had an alert mind and employed effective methods to sell his property for as high a price as possible. His successive downgrading of the sales price appears to have been solely the result of market experience obtained through at least five different listings with at least three different real estate brokers. His own testimony does not support his claim that he was overreached. The sole reason for the delay in carrying out the contract of January 17, 1958 was the marketable condition of his title. The trial court's finding that the consideration was adequate is amply supported.

■■ The granting or withholding of specific performance of a contract rests in the sound discretion of the trial court, to be exercised according to settled principles with reference to the facts of each particular case.[1] The trial court did not abuse its discretion in ordering specific performance of appellant's contract of sale in this case. The judgment below is affirmed.

1. Peterson v. Moore, 3 Alaska 155, 162 (1906).