**William F. HALL, and Hall Yenta Mining Company, A Limited Partnership, Appellants,**

**v.**

**ADD–VENTURES, LTD., A Limited Partnership, Successor in Interest to Add-Ventures, Inc., an Alaskan Corporation, Appellees.**

**No. 7130.**

Supreme Court of Alaska.

Feb. 22, 1985.

Rehearing Denied April 1, 1985.

---

William F. Hall, Anchorage, pro per.

A. Lee Petersen, and Randall E. Farleigh, Anchorage, for appellees.

Before BURKE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

This appeal arises out of a quiet title action which was instituted by Add-Ventures in superior court regarding approximately 140 mining claims near Petersville, Alaska. In his answer appellant William F. Hall asserted in part, by way of counterclaim, that Add-Ventures had agreed to sell him all of the mining properties involved in the quiet title action. Asserting that he was the equitable owner of the subject mining properties Hall requested specific performance of the alleged contract of sale. The superior court held that no contract was formed and therefore denied specific performance and this appeal followed.[1]

### I. Facts

In July, 1978, after falling behind on payments to John Jacobsen in connection with its 1976 purchase of the Peters Creek mining properties (Petersville claims), Add-Ventures leased thirteen of the claims. The lease was negotiated between C.E. Bergland, President of Add-Ventures, and William Hall; it listed as lessees C.E. Bergland, K.C. Bergland, William Hall, and Paul Walters (4 Duc's). The lease provided in part that the 4 Duc's had a right of first refusal as to any proposed sale of the Petersville claims.

On November 7, 1978 Add-Ventures and Alice Bergland, to whom Add-Ventures had conveyed a portion of the Petersville claim, offered Hall the Petersville property. The offer read as follows:

> November 7, 1978
>
> The mining properties known as the Peters Creek Mines are hereby offered for sale to Mr. William Hall for a total price of One Million Dollars ($1,000,000.00) by Add-Ventures, Inc. and Alice E. Bergland. The down payment is 25% ($250,000.00) and the terms are negotiable. Mrs. Bergland's property comprises 10% of the total property.
>
> s/C.E. Bergland,
> C.E. Bergland, President
> Add-Ventures, Inc.
> s/Alice E. Bergland
> Alice E. Bergland

Subsequently, on November 29, 1978, Alice Bergland conveyed to Hall, by quit claim deed, her portion of the Petersville property.[2] On March 27, 1979, Hall wrote C.E. Bergland indicating in part that he was "in a position to exercise the remainder of the purchase agreement on the Petersville mining property with a down payment of $225,000 on the selling price of $900,000."[3] Three days later, on March

---

1. The parties and issues involved in the quiet title action were both numerous and complex. The superior court's holding that no contract was formed and denial of specific performance to Hall are the only issues decided by the superior court that any of the parties have appealed.

2. Hall, in turn, signed a deed of trust and a trust note.

3. Hall's acceptance was explicitly contingent upon the following terms and conditions:

(1) That, the two law suits by Mr. Jacobsen against Add-Ventures, Inc. be dismissed with prejudice.
(2) That the deed of trust foreclosure by Mr. Jacobsen against Add-Ventures, Inc. be terminated.
(3) That any other claims by Mr. Jacobsen against Add-Ventures, Inc. pertinent to the mining property in question be released.
(4) Then it is understood that the various releases and dismissal of the law suits will be executed at the time of closing of the purchase escrow, bringing all payments current

30, 1979, Add-Ventures and Hall signed an escrow agreement and opened the account with an initial deposit of $100.00. Instructions accompanying the escrow agreement provided that $275,000 was to be deposited as a down payment on the purchase price. By mutual agreement the amount of the down payment was changed to $270,000. On April 5, 1979, Hall's financier, Vern Hall, arranged for a $200,000 deposit into the escrow account. Although deposited with the bank, this money was inaccessible to Add-Ventures as both the bank and Vern Hall placed restrictions on any withdrawal.[4]

On April 4, 1979, the shareholders of Add-Ventures approved the sale of the Petersville claims to Hall. The relevant part of the minutes from that meeting read as follows:

> RESOLVED: The shareholders approve the terms for sale in Mr. Hall's letter of March 27, 1979, provided the terms are sufficient to deal with current liabilities of Add-Ventures to John Jacobsen and other bills needed to be paid. The Board of Directors is authorized to proceed with negotiations of the sale of the Peters Creek Mining Properties.

Thereafter, on April 9, 1979, C.E. Bergland notified Hall of the shareholders' unanimous approval of the sale of the Petersville mining claims to him. Bergland's letter reads in relevant part:

> The Board of Directors and Stockholders of Add-Ventures, Inc. have approved the sale of the Peters Creek mining claims to you on the terms stated in your letter of March 27, 1979, provided there is a substantial earnest money posted to show your good faith and the payoff

terms are agreed at not less than $100,000.00 per year plus 9% interest.

Due to the pressures from legal actions pending against Add-Ventures at the present time, no more than 30 days from the date of your letter can be allowed for closing of this transaction.

If more than 30 days elapses from your letter of March 27, in other words, if the sale is not closed by April 28th, 1979, Add-Ventures will not be bound to sell to you and any rights you may have under the lease-option to 4-Ducs will be considered to have expired.

Please advise whether this is acceptable to you.

Upon receiving Bergland's letter of April 9th, while in the presence of both Bergland and an attorney, Hall wrote "received" on the letter, then signed and dated it. On April 10, 1979, the board of directors of Add-Ventures convened. During this meeting the board requested that Hall, who was present at the meeting, deposit $270,000 as earnest money, apparently forfeitable. This figure reflected the amount of money the board considered necessary to forestall the pending Jacobsen foreclosure on the Petersville claims. Hall protested the requirement of a $270,000 forfeiture deposit; in lieu, Hall offered to advance $10,000 in earnest money. Add-Ventures rejected this offer.

Subsequently, on April 11, 1979, C.E. Bergland wrote Hall, informing him that the board had rejected his purchase offer "for lack of substantial earnest money." Bergland's letter stated in part:

> For all these reasons and many others discussed at the Board meeting which

---

on the property, plus interest, costs, and reasonable attorney's fees incurred, and payment of all liens against the property.

4. The special escrow instructions which were part of the escrow agreement provided as follows:

SPECIAL ESCROW INSTRUCTIONS— PROPERTY PLACED IN ESCROW
$100 ck# 815 from William F. Hall to open escrow account—
 escrow to receive approx. $275,000 to disburse in payment of purchase price on Peters

Creek mining claims for $900,000. Balance to be secured by Deed of Trust payable at $100,000 per year due on June 1 of 1980 and payable on the 1st business day after January 1, 1981 and each year thereafter until paid in full. —Deed, Deed of Trust & Note to be escrowed.
Release of Liens for DOWL Engineers & LaValde Renshaw
 Stipulations for Dismissal of 2 lawsuits Jacobsen vs Add-Ventures.

you attended, you are hereby formally notified that your offer to purchase the Peters Creek Mining Claims was rejected by the Board of Directors of Add-Ventures, Inc. on April 10, 1979 for lack of a substantial earnest money deposit; that nothing less than $270,000 (the full down payment) can be accepted as an earnest money deposit because of Add-Ventures' current financial situation and for the reason stated at the Board meeting; that you will be allowed an additional grace period until 10:00 A.M. April 16, 1979, to post with Add-Ventures' attorney ... an acceptable earnest money deposit, not less than $270,000, showing ability to complete your proposed purchase; and that if such earnest money is not posted by April 16, that the Board of Directors of Add-Ventures, Inc. feels that they have been more than reasonable in efforts to accomodate you, and therefore will recognize no further obligation to sell the mining claims to you on the price and terms previously discussed nor to accord you any priority of right to purchase such mining claims over any other prospective purchaser.[5]

On April 17, 1979, Add-Ventures formally notified Hall that his allowed purchase time had elapsed. Thereafter Hall made repeated attempts to "close the deal" as to the Petersville mining claims. Hall had secured another financier, Frank Coluccio, willing to put up $270,000 or whatever amount was needed to close, but Add-Ventures subsequently rejected all offers.

As indicated at the outset, after a non-jury trial the superior court concluded that Hall was not entitled to specific performance of his alleged contract to purchase the Petersville mining claims. The superior court's rationale for its holding was:

> That the parties engaged in numerous negotiations, changes, and modifications of terms and conditions related to sale of the Peters Creek mining claims. That on April 10, 1979 at the Board meeting attended by the defendant William F. Hall, all parties agreed to enter into a contract

5. The balance of Bergland's letter of April 11, 1979, reads as follows:

> Pursuant to direction of the Board of Directors of Add-Ventures, Inc. in a meeting on April 10, 1979, which you attended at my invitation, this letter is to formally advise you of the action of the Board of Directors on your proposed purchase of the Peters Creek Mining Claims.
>
> Since you were present at the meeting, I need not repeat all of the considerations which entered into the Board's conclusion and resolution to reject your offer to purchase the Peters Creek Mining Claims. Suffice it to say that after more than five months of waiting for you to arrange your financing for the purchase, with many pressures of litigation and creditors in the meantime and substantial expenditures of time and money to protect the propertys [sic] that you could complete your proposed purchase, that a closing date was set for April 3 with your full knowledge and concurrence, and that you were unable to perform your part of the bargain on April 3 and the closing had to be postponed; that another closing date has now been set for April 17, two weeks later, and it does not now appear that you are currently in any better position to complete the closing by that date; that due to the pressures of litigation and the possibility that Add-Ventures may be enjoined from selling the property unless the settlement agreement with Mr. Jacobsen can be completed (which is dependent on your closing by the 17th of April), that Add-Ventures is in a position of substantial risk and exposure to loss which has been at least in part caused by your prolonged inability to perform your part and complete the purchase of the property, and that Add-Ventures is simply not in a position to wait any longer and must begin to look for alternative financing or for an alternative purchaser of the property.
>
> ... [Deleted ¶ quoted in text]
>
> In other words, you have until April 16, 1979 at 10:00 A.M. to raise the money to complete the purchase. Otherwise, all deals are off.
>
> You should also be aware that I will be making every effort in the meantime to arrange alternative financing either on a short-term or long-term basis, and will be contacting stockholders and others for a loan to the company or other financing arrangements in order to raise the required funds to protect Add-Ventures' interests in the property. And, if I am successful in any of these efforts, that we will expect you to live up to your commitment, stated to the Board of Directors at the meeting on April 10, 1979, to increase the purchase price and down payment accordingly.
>
> Best of luck. We hope to see you succeed. But the purchase must be completed by the first of next week.

of the sale of said mining claims on the condition that the defendant William F. Hall would deposit the sum of $270,000 into the escrow account at Security National Bank on or before Monday, April 16, 1979 at 10:00 A.M. This agreement between the parties constituted a condition precedent of a necessary and essential condition to the formation of the bilateral contract to purchase said mining claims. The defendant William F. Hall and his partner Paul Walters failed to perform that condition on time. Accordingly, the court finds that no contract was entered into between the parties and there exists no equitable grounds in favor of the defendants Hall and Walters that would permit this court to grant a request for specific performance.

## II. *Specific Performance*

Hall argues that a binding contract for the purchase of the Petersville mining claims was entered into entitling him to specific performance against Add-Ventures. Add-Ventures argues that the requisite contractual elements of intent, acceptance, and essential terms are lacking, thus precluding finding that anything other than negotiations had taken place. Alternatively, Add-Ventures argues that even had a contract existed, Hall's prospective inability to perform excused Add-Ventures from performance.

### A. *Statute of Frauds and Hall's Alleged Prospective Inability to Comply With Any Contract of Sale.*

#### 1. *Statute of Frauds*

AS 09.25.010(a) provides in relevant part: In the following cases and under the following conditions an agreement, promise, or undertaking is unenforceable unless it or some note or memorandum of it

is in writing and subscribed by the party charged or by an agent of that party:

. . . . .

(6) an agreement for leasing for a longer period than one year, or for the sale of real property, or of any interest in real property, or to charge or encumber real property; ...

Assuming an agreement for the sale of the Petersville mining properties was reached between Add-Ventures and Hall, the contract would then come within the statute of frauds. Hall argues that the contract provides a reasonably definite written description as to all terms, thereby satisfying the statute. Add-Ventures claims that the documents upon which Hall relies are to uncertain to constitute an agreement under the statute.[6] Specifically, Add-Ventures claims that the documents fail to delineate which mining claims Hall was to purchase.

 When a contract is subjected to a statute of frauds claim, "extrinsic evidence may be received to show the application of the terms of the description given in the memorandum, but not to supply missing elements without which the description is hopelessly defective."[7] In the case at bar, the question does not concern a missing element but rather indefinite description. Review of the extrinsic evidence in this case reveals that the Petersville mining claims listed in Bergland's April 9, 1979 letter and in Hall's earlier March 27, 1979 letter refer to the same claims described in Exhibit A accompanying the July 1978 lease between Add-Ventures and Hall (4-Duc's). No indication exists that either party referred to different property or intended a different description. Thus, we conclude that if the parties reached an agreement for the sale and purchase of the Petersville mining claims, such contract is not invalid under the statute of frauds.

---

6. In *Custis v. Valley Nat. Bank of Phoenix,* 92 Ariz. 202, 375 P.2d 558, 561 (1962) the court stated that in order to satisfy the statute of frauds the contract must include "the identity of the buyer and seller, the price to be paid, the time and manner of payment, and the property

to be transferred, describing it so it may be identified."

7. *Mitchell v. Land,* 355 P.2d 682, 685 (Alaska 1960).

### 2. Hall's Alleged Inability to Comply With Any Contract of Sale.

Again, assuming the existence of a contract, Add-Ventures asserts that Hall's prospective inability to perform discharged Add-Ventures' duty to perform. Add-Ventures claims that during the board meeting of April 10, 1979 it became clear that Hall was insolvent; he did not have the money to pay the $270,000 down payment and he did not know how he would get it.

 The uncontested facts in the instant case are that Hall had arranged a $200,000 deposit to the escrow account established by Add-Ventures and Hall on March 30, 1978 and that he had offered Add-Ventures a $10,000 forfeiture deposit on April 10, 1979. In our view, these facts in themselves are sufficient to establish that Hall was not actually insolvent at any time in question. Although Add-Ventures may have suspected that Hall was insolvent, mere doubt as to the other party's solvency does not justify repudiating the contract.[8]

### B. Contract Formation

 It is generally held that specific performance is an equitable remedy, the granting or withholding of which rests in the discretion of the trial court. *Stenehjem v. Kyn Jin Cho*, 631 P.2d 482 (Alaska 1981); *Hitz v. Property Investments, Inc.*, 368 P.2d 929 (Alaska 1962). The granting of specific performance presumes the existence of a valid contract.[9] In his treatise on Contracts, A. Corbin writes:

A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract; they must have expressed their intentions in a manner that is capable of understanding. it is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract.[10]

In *Stenehjem v. Kyn Jin Cho* we observed that:

[T]hese statements are tempered by language in the same section encouraging courts to give legal effect to the intentions of the parties where necessary to reach a fair and just result. [1 A. Corbin, Contracts § 95, at 400] ... Similarly, Restatement (Second) of Contracts § 32(2) (Tent. Drafts 1–7, 1973) provides, "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." We have adopted this method of analysis in the past, and a review of the factual situations presented to the court is important to an understanding of the principles involved.[11]

 Hall contends that all documents relevant to the purchase contract, viewed as a whole, evince the essential terms of a

---

**8.** Insolvency is "not a conclusive factor" of prospective inability and "does not in itself discharge the other party from further duty" A. Corbin, Corbin on Contracts § 1263, at 1022. *See also* Restatement (Second) of Contracts § 252 (1981).

**9.** Formation of a contract requires an offer, encompassing all essential terms, an unequivocal acceptance by the offeree of all terms of the offer, consideration, and intent to be bound by the offer. S. Williston, Williston on Contracts, (Third Edition) § 64, at 211, § 72, at 235, § 73, at 238 (1957). Where acceptance is conditional,

altering material terms of the offer, a counter-offer results. In such event, the original offeror becomes the offeree to whom power of acceptance transfers; formation of a contract in this circumstance requires unconditional assent to the counter-offer. At any time prior to acceptance, however, the power of acceptance can be revoked by the offeror. A. Corbin, Corbin on Contracts § 38, at 61, § 82, at 130 (1952).

**10.** 1 A. Corbin, Contracts § 95, at 394 (1963).

**11.** *Stenehjem v. Kyn Jin Cho*, 631 P.2d 482, 485.

binding contract.[12] Add-Ventures argues that no specific designation existed and thus the description "Peters Creek mining claims" is too uncertain to be enforceable, particularly because problems of title existed as to several of the individual claims.

Our previous discussion of, and holding relating to, the statute of frauds is dispositive of this issue. Here, the property offered to Hall was described as the "Peters Creek mines." The record shows that Bergland understood that the November 7, 1978 offer conveyed all of Add-Ventures' Peters Creek claims. Also, Add-Ventures admitted in its answer to Hall's counterclaims that the offer was for the mining claims described in Exhibit A of Add-Ventures' quiet title complaint. Given this extrinsic evidence, we conclude that the property designated for sale was described with "reasonable definiteness."

We now turn to the most significant aspect of this appeal, namely, whether an enforceable contract was formed by the parties. In our view, *Kodiak Island Borough v. Large*, 622 P.2d 440 (Alaska 1981) is relevant to the resolution of this contract formation issue. That case involved an action for specific performance of a municipal land-sale contract. The Borough claimed that the writings did not possess the requisite certainty of terms of a specifically enforceable contract. The language of the Borough's offer read as follows:

> The Assembly has authorized this office to negotiate a sale for the 4.22 acres of land for a price of $10,550.00. This would be $2,500 per acre. Please be advised that you should notify this office within ten days, or by September 25,

1975, if you wish to accept this proposed sale price.

*Id.* at 447. The language of the acceptance, dated September 24, 1975, read as follows:

> I accept the price of $10,550.00 for the 4.22 acres of land that you suggest in your letter 15 September, 1975.
>
> I note that you say you have the power to negotiate, which I presume means to discuss and agree upon the mode of payment.
>
> I propose a down-payment of ten percent (or $1,000) and propose the payment of the balance over a term of ten years at six percent (6%) interest on the unpaid balance.
>
> Please notify me of a convenient time that we may meet to finalize this matter.

*Id.* In *Large* we stated that:

> [I]t is clear that the offer constituted an invitation to contract, as opposed to mere preliminary negotiations, despite its paucity of terms. As Professor Williston states:
>
>> Where the property to be sold is accurately defined and an amount stated as the price in a communication made, not by general advertisement, but to one person individually, no reasonable interpretation seems possible except that the writer offers to sell the property described for the price mentioned. [Footnote omitted].

Thus, to determine whether an enforceable contract has been created, it is necessary to evaluate the nature of Large's reply to the offer. If the reply is a valid acceptance, an enforceable contract would be created. If the terms suggested by Large constitute a condi-

---

12. It is well established that to be specifically enforceable a contract must be reasonably definite and certain as to its terms. *Hollaus v. Arend*, 511 P.2d 1074, 1075 (Alaska 1973); *Rego v. Decker*, 482 P.2d 834, 838 (Alaska 1971); *Lewis v. Lockhart*, 379 P.2d 618, 622 (Alaska 1963); *Alaska Creamery Products, Inc. v. Wells*, 373 P.2d 505, 510 (Alaska 1962).

Where uncertainty of terms is alleged, the general view is that contracts are to be interpreted so as to "give effect to the reasonable expectations of the parties, that is, to give effect

to the meaning of the words which the party using them should reasonably have apprehended that they would be understood by the other party." *Craig Taylor Equipment Co. v. Pettibone Corp.*, 659 P.2d 594, 597 (Alaska 1983). Determining the "reasonable expectations" of contracting parties is assessed through reference to "the language of the disputed provision, the language of other provisions of the contract, and relevant extrinsic evidence." *Mitford v. De Lasala*, 666 P.2d 1000, 1005 (Alaska 1983).

tional acceptance, it would be a counter-offer and thus a rejection of the original offer.

However, when the acceptance of the offer is initially unconditional, the fact that it is accompanied by a request or a direction looking to the performance of the contract does not render the acceptance ineffective nor give it the character of a counter-offer so long as it does not limit the contract.

Here, Large unequivocally accepted the Borough's offer. The fact that the assent was accompanied by a suggestion as to terms of payment, a detail not inconsistent with the Borough's offer, did not convert it into a counter-offer.... Large's reply was an unconditional assent which did not materially depart from the offer [footnotes omitted].[13]

■■■ Adopting an analysis similar to that employed in *Kodiak Island Borough v. Large,* we conclude that an enforceable contract was created in the instant case. On November 28, 1978, Add-Ventures and Alice E. Bergland offered the subject properties specifically to Hall for $1,000,000 with a down-payment of $250,000. On March 27, 1979 Hall wrote to C.E. Bergland, the president of Add-Ventures, saying that he was in a position to purchase the remaining Petersville properties for $900,-000 with a down-payment of $225,000.[14] Then on March 30, 1980, Add-Ventures and Hall signed an escrow agreement which provided for a down payment of $275,000

on a purchase price of $900,000 with the balance to be secured by a deed of trust and the remaining payments to be not less than $100,000 annually. Also of significance is the fact that on April 4, 1979 the stockholders approved the sale of the Petersville claims to Hall on the terms of Hall's March 27, 1979 letter. We therefore conclude that Add-Ventures' offer of November 28, 1978, Hall's letter of March 27, 1979, and the agreed upon escrow terms of March 30, 1979 together constitute an enforceable contract.[15]

### C. *Remedy*

The question remains whether Hall's failure to deposit the full $270,000 down payment into the escrow account by April 16, 1979, was a breach of a condition of timeliness which could justify Add-Ventures' repudiation of the contract.

■■■ There is no indication of a specific time limit in the writings which we have held comprise the contact.[16] Where no provision is made as to time of performance, a reasonable time is implied, to be determined upon consideration of the subject matter of the contract, what was contemplated at the time the contact was made, and other surrounding circumstances.[17] Ordinarily, what constitutes a reasonable time is a question of fact for the trial court.[18] If, upon remand, the superior court determines that no time was agreed upon in the contract for deposit of the

13. *Kodiak Island Borough v. Large,* 622 P.2d 440, 447–48 (Alaska 1981).

14. The November 28, 1978 offer to Hall indicated that Alice E. Bergland owned 10% of the properties comprising the land subject to the offer. Between the November 28, 1978 offer and Hall's letter of March 27, 1979, Hall had entered into a purchase agreement with Alice Bergland for her separate share of the properties.

15. The superior court held that no enforceable contract was entered into because, as a result of the April 10, 1979 meeting of the Board of Directors of Add-Ventures, the sale of the Petersville mining properties was made conditional upon Hall's depositing the sum of $270,000 in the escrow account on or before 10:00 a.m.

April 16, 1979. The superior court's reliance upon a condition precedent rationale is inappropriate since an enforceable contract was entered into by the parties prior to the April 10, 1979 meeting of the Board of Directors.

16. Neither party has briefed the question of the time contemplated for performance of the $270,000 deposit.

17. *Stewart v. Cunningham,* 219 Kan. 374, 548 P.2d 740, 745 (1976); *Smith v. Smith,* 4 Wash. App. 608, 484 P.2d 409, 411 (1971); *City and County of Honolulu v. Kam,* 48 Hawaii 349, 402 P.2d 683, 687 (1965); *Shull v. Sexton,* 154 Colo. 311, 390 P.2d 313, 316 (1964).

18. *Dutch Inns of America, Inc. v. Horizon Corp.,* 18 Ariz.App. 116, 500 P.2d 901 (1972).

$270,000, it should determine whether Hall exceeded a reasonable time limit by failing to complete the down payment deposit by April 16, 1979.

REVERSED and REMANDED.[19]

---

**19.** If, upon remand, it is determined that no breach of a condition of timeliness occurred, and that Hall is entitled to specific performance, the superior court should then: grant Hall a reasonable time within which to comply with the contract payment terms, and, if necessary, require an accounting in order to determine the respective rights and obligations of the parties under the contract.