OPINION
MAASSEN, Justice.
I. INTRODUCTION
Anna Young and David Kelly fished together on David's boat during their marriage, which lasted from 1982 to 1985. Eight years after the marriage was dissolved, the federal government established a program assigning individual fishing quotas (IFQs) to certain commercial fishers; David qualified for the program and was awarded quota shares. In 1995 he approached Anna and asked whether they could reach an agreement that would prevent litigation over her right to a marital share of the IFQs. Anna agreed to forgo suit; David began paying her money, sporadically and in varying amounts. After 18 years of this, David's payments stopped. Anna filed suit in 2011, alleging that David had breached their contract. She also filed a motion under Alaska Civil Rule 60(b)(6), seeking to reopen their 1985 property division and allocate the IFQs as a marital asset.
The superior court granted summary judgment to David, deciding that any contract for something other than a marital share was too indefinite to be enforced, that the IFQs were not marital property, and that Anna therefore had no right of recovery. We affirm.
II FACTS AND PROCEEDINGS
Anna Young and David Kelly were married in 1982. During their marriage they both worked on David's fishing boat, the F/V Arrow. In January 1985 the couple dissolved the marriage, agreeing in the dissolution that they had no marital property and that the F/V Arrow belonged to David.
Eight years later, in 1998, the federal government enacted regulations assigning individual fishing quotas to vessel owners or lessees who had made fixed gear landings of halibut or sablefish (black cod) during certain "qualifying years," 1988, 1989, or 1990.[1] David had fished during the qualifying years and thus qualified for IFQs. The amount of his quota shares for halibut was calculated under the federal regulations using his five highest annual landings from the seven "base years," 1984 to 1990.[2] One of David's highest-yielding base years was 1984, one of the years of his marriage, when he and Anna fished together on the F/V Arrow.
In 1995, David learned that other ex-spouses had reopened their divorce proceedings for the purpose of allocating IFQs as marital property. David approached Anna about reaching an agreement that would dissuade her from litigating the ownership of his IFQs. The substance of their resulting agreement is in dispute.
Anna described the agreement's terms in her complaint, deposition testimony, answers to interrogatories, and affidavits. The contract she alleged in her complaint was an agreement that she "was entitled to her marital share of the IFQs and that payments as to such would be made to [her] over time until paid in full." The complaint alleged that David had agreed to make the payments "when [Anna] needed [money] upon a reasonable request," and that his commitment would end ultimately by "a lump sum payment to be made [when Annal started a business [and] settled down."
*155 At her deposition, Anna testified that she and David never agreed on a specific amount that he owed her, and she still had no firm figure in mind. She testified that at the time they made their agreement no one knew what an IFQ was worth; "We didn't even know if [the IFQ program] was going to stick." She and David also never agreed that she was entitled to any particular percentage of the IFQs, were they to be someday valued. What they agreed to instead of a dollar figure, according to Anna's deposition testimony, was that "I would not bring lawyers into our business as long as he was fair with me, and we made a deal that he was going to be fair."
Anna further testified that on the day they reached this agreement, David wrote her a check for $6,000. She testified that the next payment was to be made "[wlhenever I needed money," and that "for almost another ten years" she and David adhered to an arrangement by which he was "to give me money whenever I needed it, for a real good reason, because he didn't want me to dwindle my money away." She testified that there was no set amount David was to pay; she just made sure they made contact every year "and that he made some kind of a payment to me," the payments being "bigger in the beginning and ... gradually [getting] smaller, down to two thousand the last time he made a payment." She also testified that David made some payments in "goods," entertaining her and her granddaughters at a restaurant in Seward and buying them "the most expensive wines," "[alnd he worked on my boat quite a bit, bought a lot of stuff for my boat," such as a radar.
Anna testified at her deposition that she considered all these payments, "during that period of time until we settled," to be interest on what David owed her; she calculated that these interest payments eventually totaled about $30,000.
Anna also testified that she and David probably never would have had to place a value on the IFQs as long as David had "kept his agreement"-that is, as long as he had "kept paying me until I was ready to start my business." She testified that at the time of her deposition she was ready to start her own business, a film-making studio, and she needed $100,000 to do it; that she might need more money next year; and that David "would have been obliged to [keep] supporting me with my business, as far as I'm concerned," because the IFQs "put him way up there [as] king of the mountain." She testified that there was "no limit" on what she could ask David for under their agreement. She also testified that since David had broken their agreement, what she wanted now was "the IFQs and ... fifty percent of the money he's made with the IFQs so far."
Anna also described the parties' agreement in answers to interrogatories. She again acknowledged that "(there was no set agreed amount as it was impossible to set a [dollar] value on [the IFQs] at that time." She again described a promise by David that he would get her started "in any business [she] want[ed] that doesn't involve fishing," and in the meantime she should "just ask [whenever] [she] need[ed] money for something legitimate." However, "I always had to have a good reason for why I need[ed] the money[;] he didn't want me to spend any of it on something that wasn't a necessity." She attested that David would usually pay only about 75% of what she asked for. She de-seribed one incident in which she demanded that David pay $1,500 for the down payment on a friend's hospitalization in Seattle, "or else our agreement not to get lawyers involved was off."
When David moved for summary judgment on Anna's contract claim, Anna filed two affidavits in opposition: her own and one by Peggy Parker, president of a research firm with extensive experience in fisheries In Anna's affidavit, she asserted that David "promised me that I would get my share of the IFQs earned by the F/V Arrow while I was married to him and working as a crew member"; she also characterized her agreement with David as that "I would get money as I needed it" and "that he would provide a significant payment toward his debt onee I was ready to settle down or started another business as long as it wasn't fishing." In addition, she asserted that "[nlow I'll be asking for some of the black cod IFQs since I *156 paid for the gear that got the 'Arrow' started fishing black cod.[3] Parker, Anna's expert, calculated the value of Anna's marital share of the halibut IFQs on the assumptions that Anna's active fishing during one of the five base years represented 20% of the IFQ shares; that in the divorcee she would have received half of those shares; and that she would then have fished those shares herself as an IFQ holder on a halibut vessel and received a 40% share of the recovery.
In Anna's answers to interrogatories, however, she took issue with the position of her expert as to the percentage of IFQs she was entitled to. Asserting that her "attorney worked it out to be 5%," she stated that "I personally feel that it should be closer to 10% in light of the way [David] forced me out of our marriage.. .. [I] still believe I should get 10% of the IFQs and 50% boat share of the money made using those [IFQs] since 1994 [plus] interest in the gold David bought with his extra money since [the IFQs] started." [4]
It is undisputed that beginning in the fall of 1995, David made a number of payments to Anna in varying amounts. The amount of the payments gradually decreased over time, until eventually David stopped making payments altogether and avoided further contact with his former wife.
In February 2011, Anna filed suit against David, alleging breach of contract and promissory estoppel. A year later she filed a motion under Alaska Civil Rule 60(b)(6), seeking to reopen the 1985 dissolution and allocate the IFQs as marital property. The superior court initially ruled that Anna's de-seriptions of the parties' contract were in many respects too indefinite and uncertain to be enforced, but her claim that David had promised her a marital share of the IFQs survived summary judgment because the court could determine her marital share; it further ruled that although the statute of frauds applied, so did the full-performance exception to the statute of frauds. The superior court also ruled that promissory estoppel could apply to David's promise to pay Anna a share of the quotas. In a subsequent order, however, the superior court ruled that the IFQs were not marital, because David did not qualify for the IFQs until years after the marriage had been dissolved, and Anna's marital share of the IFQs was therefore zero. Accordingly, the superior court dismissed Anna's suit for breach of contract and denied her Rule 60(b)(6) motion to reopen the dissolution.
Anna appeals, arguing that a portion of the IFQs was marital property because she was married to and fished with David during one of the base years used to determine the IFQs' value. David cross-appeals, arguing that he has no contract with Anna, that any contract was barred by the statute of frauds, and that promissory estoppel does not apply to any promise he may have made.
III. STANDARDS OF REVIEW
We recently clarified the standard of review for decisions whether to classify property as marital.
The characterization of property as separate or marital may involve both legal and factual questions. Underlying factual findings as to the parties' intent, actions, and contributions to the marital estate are factual questions. Findings of fact are reviewed for clear error, but whether the trial court applied the correct legal rule in exercising its discretion is a question of law that we review de novo using our independent judgment.[5]
We review motions for summary judgment de novo, affirming the superior court if the record presents no genuine issues of material fact and if the movant is entitled to judgment *157 as a matter of law.[6] In making this assessment, we draw all reasonable inferences in favor of the non-moving party.[7] We review for abuse of discretion an order denying a Rule 60(b) motion.[8]
IV. DISCUSSION
A. With The Possible Exception Of An Agreement To Pay Anna Her Marital Share, The Alleged Contract Is Not Enforceable Because It Lacks Definite And Certain Terms.
In an action to enforce a contract, "Alaska plaintiffs must show: 'an offer encompassing all essential terms, unequivocal acceptance by the offeree, consideration, and an intent to be bound.'"[9] To be enforceable a contract must also "have reasonably definite and certain terms."[10] "The contract amount, in particular, must be definite and specific."[11] "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."[12] Courts will fill in gaps where parties' reasonable expectations are clear, but they cannot impose performance where it is not clear the parties had a meeting of the minds.[13]
As explained above, the evidence Anna submitted described the parties' agreement in various ways, including (1) that David would pay Anna her marital share of the IFQs,[14] and (2) that in lieu of determining Anna's marital share, David would give Anna money upon reasonable request, including the money to set her up in business when she was ready, and he would continue to support her thereafter without limit as long as she did not "bring lawyers into our business."
The superior court carefully sifted through Anna's descriptions of the parties' agreement in its order denying summary judgment. The superior court concluded that Anna "has provided at least one description of her agreement with [David] that has sufficient definition for the Court to identify a breach and to craft a remedy," that agreement being "that [Anna] would receive her share of the [IFQs]." The other agreement described by Anna was essentially that David would pay indefinite sums of money for an indefinite time (but only if he agreed that the payments were necessary, and then not always in the amounts requested); the payments were either installments or interest payments on a principal amount that was itself undetermined. Any such agreement lacks the "reasonably definite and certain terms" necessary for contract formation,[15] including the contract amount,[16] and leaves the court without sufficient basis for determining whether the contract has been breached and, if so, how to formulate a remedy.[17]
Because there is no enforceable contract, we need not discuss the statute of frauds or its exceptions for part performance or full performance. Nor does promissory estoppel provide an alternate remedy; the doctrine requires an actual promise that "must be definitive, must be very clear, and must use precise language."[18] The "actual *158 promise" necessary for the application of promissory estoppel "is 'analytically identical to the acceptance of an offer in contract law." [19]
However, we agree with the superior court that a promise to pay the marital share of the IFQs-with the amount left to be determined-could ordinarily be definite enough to be enforced, since the law of marital property provides a basis for determining whether there is a breach and for creating an appropriate remedy.[20] But this is not an ordinary case, given that (1) Anna herself at times described a different contract,[21] (2) Anna's own testimony was in conflict over whether David's periodic payments over the course of 13 years were part of her marital share or only interest on that undetermined amount, and (8) Anna disagreed with the value of the marital share reached by her own expert.[22] Even so we do not need to decide whether Anna's contract claim to a marital share properly survived summary judgment. Like the superior court, we conclude that the IFQs were not marital; there was thus no marital share to which Anna could have been contractually entitled.
B. The IFQs Were Not Acquired During Marriage And Therefore Are Not Marital Property.
We have held IFQs to be marital property and divided them between the divoreing parties on three previous occasions.[23] In Ferguson v. Ferguson, the parties married in 1988 and divorced in 1994; their marriage spanned all the qualifying years.[24] The parties in both Johns v. Johns and McGee v. McGee were married through all the base years and the qualifying years.[25] These cases are thus readily distinguished from this one. Anna and David's marriage had been dissolved for eight years before the IFQ program even began; the first qualifying year was not until three years after the dissolution.
Determining whether property is marital begins with AS 25.24.160(a)(4). The statute authorizes courts to "provide ... for the division between the parties of their property, including retirement benefits, whether joint or separate, acquired only during marriage" (emphasis added). "The invasion of post-marital acquisitions for purposes of property division is obviously not permitted by the statute."[26] And "the date for segregating marital from post-marital property is ordinarily the date of the functional termination of the marriage." [27] Thus, we may consider the IFQs at issue here to be marital only if they were "acquired" during Anna and David's marriage.
We have broadly interpreted the term "acquired" in order to accomplish the statutory goal that property division "fairly allocate the economic effect of divorce.[28] For example, although pension benefits might not be received until long after divorce, we deem them acquired during mar *159 riage to the extent the working spouse earns them during marriage; [29] we held in Laing v. Laing that this is so "regardless of whether they have vested" before divorce.[30] We adopted this rule because "[plension benefits are generally viewed as deferred compensation for services rendered and the employee spouse's right thereto is a contractual right," [31] and " '[tlhe fact that a contractual right is contingent upon future events does not degrade that right to an expectancy." [32] In short, under Laing, the contingent contractual right to a future benefit is sufficient basis on which to conclude that the benefit is "acquired" during marriage and is therefore marital
It is undisputed in this case that the parties, during their marriage, lacked even the "expectancy" of a future benefit related to the IFQs. Anna acknowledged in the superi- or court that at the time of divoree the fishing business "had an uncertain[ ] but limited value"; she asserted in her affidavit that David assured her of her fair share "if IFQs ever happened." This uncertainty and speculation fall far short of an "expectancy," let alone the contingent contractual right that we held in Laing was sufficient to show that a future benefit was "aequired ... during marriage."
In Winther v. Samuelson, we interpreted McGee and Johns to mean that "[quotal shares should be considered marital property to the extent that the [quotal entitlement was earned during the marriage."[33] This is consistent with our pension cases; [34] it is also consistent with Ferguson, where the IFQ was acquired during a marriage that spanned the qualifying years, and this court looked to the husband's premarital labor during the base years to determine whether a portion of the IFQ was his separate property.[35] The claim in Ferguson-that premarital work enhanced the value of an asset that was plainly earned during the marriage-is unlike the claim here: that marital work enhanced the value of an asset that did not even come into existence until years after the marriage was over.[36]
Anna contends that it is unfairly restrictive for the court to consider only the qualifying years in determining whether the IFQs are marital, since it is undisputed that marital labor during one of the base years did add to the asset's value once the asset came into being. We have recognized that property acquired outside of marriage can become marital property to the extent marital efforts contribute to its value.[37] But cases applying this principle address premarital property brought into the marriage or separate property acquired during marriage; they do not address property that did not even exist during marriage, even in the sense of a contract right to someday receive it.[38] We have never held that property acquired after divoree may become marital if, in retrospect, it can be seen to have more value than it would have had absent the marriage, and AS 25.24.160(a)(4) does not allow it. Practically speaking, there are few acquisitions and achievements in life that cannot be traced to life's earlier stages. Every advancement, bo *160 nus, and business success is founded on a personal history that may well include marriage and divorce. But if at the time of divorce the parties can only speculate that certain property might come to exist in the future, with not even a contingent contractual right to ensure that it does, such property was not "acquired during marriage." We would do a major disservice to the express statutory language if we were to hold that such property was marital.[39]
The dissent argues that our decision today "ignor[es] the definition of 'acquisition' adopted in almost all equitable distribution states," Le., "that property is acquired whenever contributions create real value, and not only at the moment when legal title passes."[40] But if the dissert's understanding of the general definition were correct, one would expect to find case law from other equitable distribution states holding that property not existing yet at the time of divorce-even in the inchoate sense of a contract right or expectancy-was nonetheless marital. Our decision is consistent with the majority definition as we understand it. The "real value" at issue in this case is the value Anna's work added to the value of the IFQ shares; that value was not created until the IFQ program came into existence, eight years after the marriage ended.
C. The Superior Court Did Not Err In Denying Anna's Civil Rule 60(b)(6) Motion.
We held in McGee that a motion to reopen a property division and allocate IFQs was properly brought under Civil Rule 60b)(6).[41] We reasoned that the creation of the IFQ program in 1993 was the type of "extraordinary circumstance" contemplated by Rule 60(b)(6) because the couple "did not address or anticipate" the program when dividing their property.[42] But since the quotas here are not marital property, there is no justification for reopening Anna and David's 1985 dissolution. The superior court did not err in denying the Rule 60(b)(6) motion.
v. CONCLUSION
The judgment of the superior court is AFFIRMED.
FABE, Chief Justice, with whom BOLGER, Justice, joins, dissenting.

. 50 C.F.R. §§ 679.40(a)(2)@)(A), 679.40(a)(3)G) (2013); Pacific Halibut Fisheries; Groundfish of the Gulf of Alaska; Groundfish of the Bering Sea and Aleutian Islands; Limited Access Management of Fisheries Off Alaska, 58 Fed. Reg. 59,376 (Nov. 9, 1993).

. 50 C.F.R. § 679.40(a)(4)(ii) (2013). Unlike halibut, the base years for sablefish began in 1985, after David and Anna had separated. There is no dispute that Anna has no marital rights to sablefish IFQs, though she does claim an interest in them as a remedy for David's alleged breach of contract.

. Anna had testified at her deposition that her agreement with David encompassed only halibut IFQs, not black cod IFQs.

. The source of the 5% figure is unclear from the record. The calculations of Anna's expert, Parker, result in a 4% share (20% of David's total IFQ shares x .5 (Anna's marital share) x .4 (Anna's IFQ holder share)).

. Beals v. Beals, 303 P.3d 453, 458-59 (Alaska 2013) (footnotes, internal quotation marks, and alterations omitted) (quoting Odom v. Odom, 141 P.3d 324, 330 (Alaska 2006); Hanson v. Hanson, 125 P.3d 299, 304 (Alaska 2005)).

. Beegan v. State, Dep't of Transp. & Pub. Facilities, 195 P.3d 134, 138 (Alaska 2008).

. Id.

. Frost v. Ayojiak, 957 P.2d 1353, 1355 (Alaska 1998) (citing Benedict v. Key Bank of Alaska, 916 P.2d 489, 491 (Alaska 1996); McCall v. Coats, 777 P.2d 655, 657 (Alaska 1989).

. Magill v. Nelbro Packing Co., 43 P.3d 140, 142 (Alaska 2001) (quoting Davis v. Dykman, 938 P.2d 1002, 1006 (Alaska 1997)).

. Madonna v. Tamarack Air, Ltd., 298 P.3d 875, 879 (Alaska 2013); Stenehjem v. Kyn Jin Cho, 631 P.2d 482, 485 (Alaska 1981).

. Magill, 43 P.3d at 142.

. Hall v. Add-Ventures, Ltd., 695 P.2d 1081, 1087 (Alaska 1985) (quoting Stenehjem, 631 P.2d at 485).

. Magill, 43 P.3d at 142.

. In her pleadings in the superior court, Anna also characterized the agreement as one for "her fair share"; she appears to equate this with her marital share.

. Madonna, 298 P.3d at 879.

. "Magill, 43 P.3d at 142.

. See Hall, 695 P.2d at 1087.

. Alaska Trademark Shellfish, LLC v. State, Dep't of Fish & Game, 172 P.3d 764, 767 (Alaska 2007) (internal footnote and quotation marks omitted).

. Id. (quoting Brady v. State, 965 P.2d 1, 6, 11 (Alaska 1998)).

. See Hall, 695 P.2d at 1087.

. For example, Auna testified at her deposition that she and David would never have had to value the IFQs if David had "kept paying me until I was ready to start my business."

. Stating that her "attorney worked [her marital share] out to [be] 5%" (apparently in reference to her expert's calculations), Anna asserted in an interrogatory answer that "it should be closer to 10% in light of the way [David] forced me out of our marriage."

. Ferguson v. Ferguson, 928 P.2d 597, 598 (Alaska 1996); Johns v. Johns, 945 P.2d 1222, 1224 (Alaska 1997); McGee v. McGee, 974 P.2d 983, 986 (Alaska 1999).

. Ferguson, 928 P.2d at 598.

. See Johns, 945 P.2d at 1224 (stating that parties "'were married in September 1984, and separated in October 1993"); McGee, 974 P.2d at 986 (stating that parties "married in 1978" and "filed for dissolution in March 1993").

. Bandow v. Bandow, 794 P.2d 1346, 1347 n. 2 (Alaska 1990).

. Hanlon v. Hanlon, 871 P.2d 229, 231 (Alaska 1994).

. AS 25.24.160(a)(4) (stating that "the division of property must fairly allocate the economic effect of divorce by being based on consideration of" various listed factors).

. Schmitz v. Schmitz, 88 P.3d 1116, 1129-30 (Alaska 2004) (citing Edelman v. Edelman, 3 P.3d 348, 356 (Alaska 2000)) (holding that the IRA in question was a marital asset subject to equitable division because it increased in value during the marriage). See also Williams v. Crawford, 982 P.2d 250, 254 (Alaska 1999) (holding that pensions earned during marriage are marital property subject to division upon divorce).

. 741 P.2d 649, 655 (Alaska 1987).

. Id. at 656 (citing Johnson v. Johnson, 131 Ariz. 38, 638 P.2d 705, 708 (1981) and In re Marriage of Brown, 15 Cal.3d 838, 126 Cal.Rptr. 633, 544 P.2d 561, 567 n. 8 (Cal.1976)).

. Id. at 656 (quoting Brown, 126 Cal.Rptr. 633, 544 P.2d at 566 n. 8 (Cal.1976)).

. 10 P.3d 1167, 1171 (Alaska 2000) (emphasis added).

. See Conner v. Commer, 68 P.3d 1232, 1235 (Alaska 2003) ("[Rletirement benefits earned during the marriage are marital property subject to equitable division.").

. See Ferguson v. Ferguson, 928 P.2d 597, 600 (Alaska 1996) (holding that a fishing quota is marital property to the extent that "the size of the quota share" is attributable to labor performed during the marriage).

. Id.

. Harrower v. Harrower, 71 P.3d 854, 858 (Alaska 2003).

. See id.

. For example, if a spouse holds an interest in intellectual property at the time of divorce, future royalties flowing from that property are marital "so long as such proceeds ... are neither 'indefinite nor speculative.' " Lynch v. Lynch, 135 Conn.App. 40, 43 A.3d 667, 675 (2012) (holding that where an author during marriage secured "a contractual right to royalties from the sale of his book," the royalties were marital property subject to division); In re Marriage of Heinze, 257 Ill.App.3d 782, 197 Ill.Dec. 506, 631 N.E.2d 728, 731 (1994) (holding that where "the book royalty contracts were executed by petitioner and {[her publisher] during the marriage" and future royalties were not "unproven or speculative," the royalties were "analogous to pension payments to be made in the future" and "should have been classified as marital property"). Similarly, "'{clourts have generally held that the mere possibility of a future inheritance or gift does not constitute divisible property"; "[the lack of a legally enforceable right distinguishes future inheritances and gifts from other contingent assets such as unvested pensions, where the owning spouse has a presently existing legal right." 2 Brett R. Turner, EouttasLe Distrisurion or Property § 6.91, at 476 (3rd ed. 2005) (emphasis omitted).

. Dissent at 163 (quoting TurnE® supra note 39, § 5.21, at 345).

. McGee v. McGee, 974 P.2d 983, 990 (Alaska 1999).

. 1d.