Frederick S. MAGILL, Donald B. Kalk, and Robert E. Pries, Appellants,

v.

NELBRO PACKING COMPANY, a Washington corporation, Appellee.

No. S–9549.

Supreme Court of Alaska.

Aug. 31, 2001.

Rehearing Denied Nov. 16, 2001.

James T. Brennan, Hedland, Brennan, Heideman & Cooke, Anchorage, for Appellants.

James E. Torgerson and Andrew F. Behrend, Heller Ehrman White & McAuliffe, Anchorage, Frederick P. Corbit and Rima J. Alaily, Heller Ehrman White & McAuliffe, LLP, and Dexter A. Washburn, Law Offices of Dexter A. Washburn, Seattle, WA, for Appellee.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Fishers and a fish packing company discussed a possible arrangement for compensating the fishers for roe herring they were to deliver to the packing company. When the fishers sued for damages, the superior court found for the packing company. Did the superior court clearly err in finding that the parties did not have an agreement with "terms that [were] specific enough to be enforced"? We conclude that it did not. We also affirm the superior court's finding that the fishers were not underpaid and its award of attorney's fees based on the packing company's successful offer of judgment.

## II. FACTS AND PROCEEDINGS

Nelbro Packing Company is a Washington corporation which owns and operates seafood processing plants in Southeast Alaska and Bristol Bay.[1] Frederick (Rick) Magill, Donald Kalk, and Robert Pries (sometimes "the Magill group") own or operate three herring seine boats, and annually engage in the Togiak herring fishery in Bristol Bay.

The Magill group caught 348 tons of herring during the 1995 Togiak herring fishery and sold it to Nelbro. Nelbro paid the Magill group according to the industry standard.[2] The Magill group received an advance price of $600 per ton plus $60 per point, and the group received another payment of $200 per ton and $20 per point in January 1996, bringing the total payment to $800 per ton and $80 per point. Nelbro's ultimate $80 per-point-formula was based on estimates—from early samples of the Magill group's herring—that the fish contained an average of 11.4% roe. Nelbro later determined that the average roe percentage for the entire catch was 12.43%. Nelbro did not adjust its point payments. On average, Nelbro paid the Magill group $915 per ton; according to unrebutted expert testimony, that was a fair price in the industry.

Magill, Kalk, and Pries filed suit against Nelbro in May 1998 seeking damages for breach of contract, conversion, and unjust enrichment. The complaint alleged that Nelbro should have paid the plaintiffs the adjusted grounds price for the herring based on a 12.43% roe content, and should have paid them a share of its profits. After learning that Nelbro made only a $27.56 per ton profit due to its unprofitable deviation from ordinary industry practice in shipping the herring to China to be stripped of roe before being sold, the plaintiffs amended their complaint. The plaintiffs now claimed that the allegedly unconventional Chinese transaction,

---

1. In about 1998 Nelbro sold some of its assets to Alaska General Seafoods Company.

2. Togiak herring are caught for the value of their roe, and the carcasses generally have little commercial value. Processors typically determine what percentage of the herrings' weight is roe and then pay fishers a base price per ton plus an amount for each percentage point by which the roe content of their catch exceeds ten percent. An advance price is customarily paid soon after delivery of the herring with an adjustment later to bring the total price up to the competitive rate.

undertaken without notice to the plaintiffs, breached fiduciary and contractual duties; the plaintiffs sought damages in the amount of profits the group would have been paid under the profit sharing arrangement if Nelbro had sold all of the Magill group's herring whole frozen F.O.B. Bristol Bay.

At trial, the Magill group offered evidence to establish that the contracting parties intended to enter into an agreement that included profit sharing. Nelbro offered evidence disputing Rick Magill's characterization of the agreement. Sitting as the trier of fact, Superior Court Judge Fred Torrisi concluded that the plaintiffs had not met their burden of establishing an agreement to share profits. The court also concluded that Nelbro did not owe the additional $27,840 sought by the plaintiffs based on the actual 12.43% roe content. The court denied the plaintiffs' Motion for Entry of Findings of Fact and Conclusions of Law and Motion for Reconsideration and entered an amended final judgment, awarding Nelbro attorney's fees of $129,727.87 and costs of $15,797.51, against the Magill group.

## III. DISCUSSION

### A. Standard of Review

■ We review questions of fact—such as whether the Magill group and Nelbro reached a meeting of the minds regarding their alleged agreement to share profits from the 1995 Togiak herring fishery—for clear error.[3] We will overturn the trial court's findings only if we are left with a "definite and firm conviction on the entire record that a mistake has been committed."[4]

### B. Evidence of Agreement to Share Profits

■ In order to meet their burden in establishing the existence of a contract, Alaska plaintiffs must show: "an offer encompassing all essential terms, unequivocal acceptance by the offeree, consideration, and an intent to be bound."[5] The contract amount, in particular, must be definite and specific.[6] Because contracting parties cannot plan for all contingencies that might arise, courts may "fill gaps in contracts to ensure fairness where the reasonable expectations of the parties are clear."[7] But "the courts should not impose on a party any performance to which he [or she] did not and probably would not have agreed."[8]

The following evidence was presented at trial: (1) Magill's testimony that he and Nelbro representatives discussed the "entire" 1995 Togiak herring profit-sharing venture at their March 9 meeting, and that they agreed Nelbro "would take the hard costs of processing, grounds price, and tendering out, and [the Magill group and Nelbro] would split 50–50 whatever was left"; (2) the deposition testimony of Mike Lee, Nelbro's president, in which he admitted that "[t]here was some discussion of a possible profit sharing program" but insisted that "there was never a formal agreement put together"; and (3) documentary evidence variously referring to

3. See Young v. Hobbs, 916 P.2d 485, 487–88 (Alaska 1996).

4. Alaska Foods, Inc. v. American Mfr. Mut. Ins. Co., 482 P.2d 842, 848 (Alaska 1971).

5. Davis v. Dykman, 938 P.2d 1002, 1006 (Alaska 1997) (affirming conclusion that parties seeking to settle personal injury lawsuit had not formed contract when they agreed that Rule 82 attorney's fees would be included in settlement but did not agree to specific dollar amount of fees, or a method to calculate such amount) (citing Young, 916 P.2d at 488; Childs v. Kalgin Lodge, 779 P.2d 310, 314 (Alaska 1989)); Hall v. Add-Ventures, Ltd., 695 P.2d 1081, 1087–89 (Alaska 1985).

6. See Alaska Creamery Prods., Inc. v. Wells, 373 P.2d 505, 510 (Alaska 1962) (holding that trial court erred in concluding that dairy distributors had contract to sell trucks to Alaska Creamery where payment was to include down payment, exact amount of which had not been specifically determined by parties; holding instead that parties had "at best an agreement to agree in the future" and explaining that court is not free to fix indefinite down payment term upon equitable considerations).

7. Rego v. Decker, 482 P.2d 834, 837 (Alaska 1971); see also Yeon St. Partners v. Environmental Consulting Servs., Inc., 125 Or.App. 501, 865 P.2d 1325, 1327 (1993) ("When the conduct or expressions of parties to an agreement indicate a sufficient intent to make a contract, a court has latitude to fill in the gaps. . . .").

8. Rego, 482 P.2d at 837.

"some form of joint/share of the misery type operation,"[9] and a "commit[ment]" by Nelbro to purchase herring "for a[n] established advance price with some form [of] profit sharing."[10]

The Magill group argues on appeal that the trial court clearly erred in concluding that the plaintiffs failed to meet their burden of establishing an agreement with Nelbro to share profits. The court concluded that "Magill's trial testimony set forth terms that [were definite and] specific enough to be enforced," but found insufficient evidence that the parties had actually agreed to these terms. The trial court declined to credit Rick Magill's trial testimony because it was "substantially different" from the testimony he had given at his deposition.

We conclude that the trial court's assessment is reasonably supported by the record. At his deposition, Magill was asked to identify the "general terms" of the 1995 Togiak herring venture as they were discussed with Nelbro representatives. Magill failed to mention the specific and definite terms of the March 9 conversation that he would later recount at trial. Magill's description of the agreement was much less detailed:

> It would be simply a fishermen-Nelbro venture using some of the Baypack fishermen and some of the non-Baypack fishermen. And we would simply get the profit—grounds price and profitsharing thereafter.

On appeal, Magill has explained that he failed to mention the specific terms of the agreement at the deposition because he was not asked specifically about the details. Although this explanation is plausible, the trial court still acted within the proper bounds of its discretion when it noted Magill's inconsistency and decided not to credit his testimony.

The trial court instead gave credit to Lee's deposition testimony that "there was never a formal agreement put together." The court found that "Lee testified inconsistently in the past." But because Lee "never gave any details as to the share to be allocated to each [party to the agreement], the method of determining the profit or whether ... the product would be marketed in a certain way," the trial court decided not to treat Lee's testimony as corroborating Magill's assertion that the parties had reached an enforceable profit-sharing agreement. We likewise conclude that the trial court's assessment of Lee's statement was reasonably supported by the evidence in the record.

Even if Lee's 1999 testimony disclaiming his earlier statement about profit-sharing was not credible, his earlier statement still could not corroborate the crucial 50/50 profit-split term that Magill described at trial. Assuming the trial court gave too much credit to Lee's testimony, such an misassessment would not amount to reversible error. Lee's initial testimony—that "the profit sharing meant that once [Nelbro had] taken all the costs that were involved in processing the product and shipping the product, if there was any profit left over after costs were deducted, then it would be split, paid back"— did not describe terms so specific and definite that the trial court was obliged to find that the parties had agreed upon definite and specific profit-sharing terms. Applying the standard articulated in *Davis*, it is not clear that an agreement to "split" and "pay back" "any profit left over after costs were deducted" describes either an amount of payment or a method of calculating an amount of payment due under the profit-sharing arrangement with sufficient definiteness and specificity to render the agreement enforce-

**9.** February 24, 1995 internal Nelbro memorandum.

**10.** A March 10, 1995 internal Nelbro memorandum stated in part:
> We have reviewed the different options discussed yesterday and have arrived at the following game plan:
> 1. *Accessing Herring:*
>    A. We will commit to Rick Magill to process the herring produced by his "group"

which he estimates to be somewhere in the range of 800 to 1000 tons. The herring will be purchased for a[n] established advance price with some form [of] profit sharing.

A March 17, 1995 internal Nelbro memorandum stated: "Because of the quick start with herring fast approaching, we would agree to just buy the Togiak herring at an advance price with some form of profit sharing on completed sales."

able.[11]  Regardless, the trial court's decision to credit Lee's 1999 deposition testimony and to place little emphasis upon his 1998 statements was not clearly erroneous.

The trial court also reviewed several documents the plaintiffs offered in attempting to prove the existence of an enforceable profit-sharing agreement; it concluded that the writings were insufficient.  The court characterized one such writing as "vague and a far cry from the detailed terms that Magill says were articulated in the March 9 agreement."  The trial court found the documentary evidence insufficient to establish an enforceable profit-sharing agreement.  We conclude again that the trial court's assessment was reasonably supported by the evidence in the record.  The documentary evidence variously referring to "some form of joint/share of the misery type operation," and a "commit[ment]" by Nelbro to Magill to purchase herring "for a[n] established advance price with some form [of] profit sharing," does not set forth price terms sufficiently definite and specific to compel the conclusion that the parties had an enforceable agreement to share profits.

We therefore conclude that the evidence left uncertainty as to the profit element and potential uncertainty as to the advance payment term that the plaintiffs sought to enforce.  Although the trial court might have assessed the evidence differently, Judge Torrisi's written decision contained a thorough discussion of the evidence and articulated a well-reasoned resolution of the issues.  The trial court did not clearly err in holding that the parties did not agree on terms.

## C.  Underpayment

■ The Magill group also argues that Nelbro owes the plaintiffs an additional $27,840 based on the actual 12.43% roe content.  The trial court concluded that Nelbro did not owe this additional amount because the Magill group did not show either that roe

percentages were actually or customarily adjusted for other fishers or that payment based on the estimated percentages was otherwise unreasonable.  We hold that the trial court's conclusion is reasonably supported by evidence, which included unrebutted expert testimony that the price the group received was a fair price in the industry.  Moreover, the group received the grounds adjustment, and no evidence in the record indicates that the parties agreed that there would be a further adjustment following the unanticipated voyage to China.

## D.  Attorney's Fees

■ The trial court awarded Nelbro attorney's fees of $129,727.87.  It based that award on its determination that, under Alaska Civil Rule 68(b)(1), Nelbro was entitled to recover seventy-five percent of its reasonable attorney's fees, which the court found totaled $172,970.50.  The Magill group argues that the trial court should have based the award on reasonable attorney's fees of $72,071.04.

It seems remarkable at first glance that the trial court found that Nelbro had incurred reasonable attorney's fees of $172,970.50 in a case involving a $200,000 controversy.  But we conclude from the circumstances discussed by the parties and from the trial court's well-reasoned discussion of this issue that the trial court did not clearly err in finding the amount of Nelbro's reasonable attorney's fees.

■ We will not overturn an attorney's fees award solely because the amount of actual fees upon which the award is based exceeds or is close to the amount in controversy.[12]  We are especially reluctant to overturn fees awards when the trial court has adequately explained its decision, and has obviously given careful scrutiny to the parties' submissions in calculating the amount of fees reasonably incurred, as the court did here.[13]  The circumstances justifying the

---

**11.**  See Davis, 938 P.2d at 1006.

**12.**  See Joseph v. Jones, 639 P.2d 1014, 1019 (Alaska 1982) (holding that award of $8,000 in attorney's fees was not manifestly unreasonable even though judgment was for only $5,000).

**13.**  See Zeilinger v. SOHIO Alaska Petroleum Co., 823 P.2d 653, 658 (Alaska 1992) (remanding for redetermination of attorney's fee award that had been based on actual fees of $200,000 in case "not particularly complex or unique" and in which "trial was relatively brief," where superior court "gave no explanation" of the award and

award include the findings that there was not "a whole lot of unnecessary paper ... filed" and that "Nelbro's actions were [not] dilatory or in bad faith." In addition, some responsibility for the large amount of fees lies with the plaintiffs, who vigorously pushed the case and insisted on a forum choice that was more expensive for the parties.

### E. *Equal Protection Challenge*

The Magill group also argues that basing the attorney's fee award on Civil Rule 68(b) and AS 09.30.065 violates the equal protection clause of the Alaska Constitution.[14] The group argues that this is so because the new Rule 68(b) "operates disproportionately" by triggering fee awards based on offers of judgment that are a least five percent more favorable to the offeree than the judgment finally rendered. The group explains that because the dollar amount of a defendant's offer is always less than the dollar amount of a plaintiff's offer, the rule requires plaintiffs to concede much more in absolute dollars than defendants in order to gain the benefits of the offer of judgment rule. For example, where outcomes range from a $0 defense verdict to a $1 million plaintiff's verdict, the rule will benefit a defendant who offers $1 and concedes only 5 cents in a case where final judgment rendered against the defendant is less than 95 cents. But in order for the plaintiff to gain the benefit of the rule in a case where the final judgment is for $1 million, the plaintiff must concede $50,000 by offering $950,000 or less. The Magill group suggests that the

rule is unconstitutional because the different treatment of plaintiffs and defendants does not bear a substantial relationship to the rule's legitimate purpose, which is to provide equal incentives to both plaintiffs and defendants to settle litigation. The Magill group cites no equal protection cases and offers nothing further to advance this constitutional argument and guide our analysis. We decline to reach this constitutional issue, because it was not preserved below or on appeal.[15]

## IV. *CONCLUSION*

We AFFIRM the trial court's judgment in all respects.

**R.G., Appellant,**

v.

"no indication [that it] carefully scrutinized the submissions and awarded Rule 82 compensation only on a percentage of reasonable expenditures").

**14.** AS 09.30.065, the Offers of Judgment statute, is a comprehensive act relating to civil actions intended to "reduce the amount of litigation proceeding to trial by modifying the allocation of attorney fees and court costs based on the offer of judgment...." Ch. 26, § 1(10), SLA 1997. This court revised Rule 68 to conform to the statute making it applicable to all actions filed on or after August 7, 1997. *See* Alaska Supreme Court Order No. 1281 (August 7, 1997). Under the new rule, if an offer was served "no later than 60 days after both parties made the disclosures required by Civil Rule 26, the offeree shall pay 75 percent of the offeror's reasonable actual

attorney fees" incurred thereafter, and correspondingly less for later offers. Alaska R. Civ. P. 68(b).

**15.** *See, e.g., Gates v. City of Tenakee Springs*, 822 P.2d 455, 460 (Alaska 1991) (claims addressed only cursorily in brief treated as abandoned on appeal); *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 528 (Alaska 1980) ("When, in the argument portion of a brief, a major point has been given no more than cursory statement, we will not consider it further."); *Wernberg v. Matanuska Elec. Ass'n*, 494 P.2d 790, 794 (Alaska 1972) (holding inadequately briefed issues abandoned on appeal, relying on case law and former Supreme Court Rule 11(a)(8) requiring briefs to cite to record and authorities in support of each point).