*Notice:  This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ANNA YOUNG, | ) | |
| | ) | Supreme Court Nos. S-14857/14858 |
| Appellant and | ) | and S-14897 (consolidated) |
| Cross-Appellee, | ) | |
| v. | ) | Superior Court Nos. 3AN-12-06299 CI |
| | ) | 3AN-11-05669 CI |
| | ) | O P I N I O N |
| DAVID KELLY, | ) | |
| | ) | No. 6944 - August 22, 2014 |
| Appellee and | ) | |
| Cross-Appellant. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Mark Rindner, Judge.

Appearances: Ted Stepovich, Law Office of Ted Stepovich, Anchorage, for Appellant and Cross-Appellee. John E. Casperson, Holmes, Weddle & Barcott, P.C., Seattle, for Appellee and Cross-Appellant.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

MAASSEN, Justice.
FABE, Chief Justice, with whom BOLGER, Justice, joins, dissenting.

## I.     INTRODUCTION

Anna Young and David Kelly fished together on David's boat during their marriage, which lasted from 1982 to 1985. Eight years after the marriage was dissolved, the federal government established a program assigning individual fishing quotas (IFQs)

to certain commercial fishers; David qualified for the program and was awarded quota shares. In 1995 he approached Anna and asked whether they could reach an agreement that would prevent litigation over her right to a marital share of the IFQs. Anna agreed to forgo suit; David began paying her money, sporadically and in varying amounts. After 13 years of this, David's payments stopped. Anna filed suit in 2011, alleging that David had breached their contract. She also filed a motion under Alaska Civil Rule 60(b)(6), seeking to reopen their 1985 property division and allocate the IFQs as a marital asset.

The superior court granted summary judgment to David, deciding that any contract for something other than a marital share was too indefinite to be enforced, that the IFQs were not marital property, and that Anna therefore had no right of recovery. We affirm.

## II.    FACTS AND PROCEEDINGS

Anna Young and David Kelly were married in 1982. During their marriage they both worked on David's fishing boat, the F/V ARROW. In January 1985 the couple dissolved the marriage, agreeing in the dissolution that they had no marital property and that the F/V ARROW belonged to David.

Eight years later, in 1993, the federal government enacted regulations assigning individual fishing quotas to vessel owners or lessees who had made fixed gear landings of halibut or sablefish (black cod) during certain "qualifying years," 1988, 1989, or 1990.[1] David had fished during the qualifying years and thus qualified for

---

[1]    50 C.F.R. §§ 679.40(a)(2)(i)(A), 679.40(a)(3)(i) (2013); Pacific Halibut Fisheries; Groundfish of the Gulf of Alaska; Groundfish of the Bering Sea and Aleutian Islands; Limited Access Management of Fisheries Off Alaska, 58 Fed. Reg. 59,376 (Nov. 9, 1993).

IFQs. The amount of his quota shares for halibut was calculated under the federal regulations using his five highest annual landings from the seven "base years," 1984 to 1990.[2] One of David's highest-yielding base years was 1984, one of the years of his marriage, when he and Anna fished together on the F/V ARROW.

In 1995, David learned that other ex-spouses had reopened their divorce proceedings for the purpose of allocating IFQs as marital property. David approached Anna about reaching an agreement that would dissuade her from litigating the ownership of his IFQs. The substance of their resulting agreement is in dispute.

Anna described the agreement's terms in her complaint, deposition testimony, answers to interrogatories, and affidavits. The contract she alleged in her complaint was an agreement that she "was entitled to her marital share of the IFQs and that payments as to such would be made to [her] over time until paid in full." The complaint alleged that David had agreed to make the payments "when [Anna] needed [money] upon a reasonable request," and that his commitment would end ultimately by "a lump sum payment to be made [when Anna] started a business [and] settled down."

At her deposition, Anna testified that she and David never agreed on a specific amount that he owed her, and she still had no firm figure in mind. She testified that at the time they made their agreement no one knew what an IFQ was worth: "We didn't even know if [the IFQ program] was going to stick." She and David also never agreed that she was entitled to any particular percentage of the IFQs, were they to be someday valued. What they agreed to instead of a dollar figure, according to Anna's

---

[2]    50 C.F.R. § 679.40(a)(4)(ii) (2013). Unlike halibut, the base years for sablefish began in 1985, after David and Anna had separated. There is no dispute that Anna has no marital rights to sablefish IFQs, though she does claim an interest in them as a remedy for David's alleged breach of contract.

deposition testimony, was that "I would not bring lawyers into our business as long as he was fair with me, and we made a deal that he was going to be fair."

Anna further testified that on the day they reached this agreement, David wrote her a check for $6,000. She testified that the next payment was to be made "[w]henever I needed money," and that "for almost another ten years" she and David adhered to an arrangement by which he was "to give me money whenever I needed it, for a real good reason, because he didn't want me to dwindle my money away." She testified that there was no set amount David was to pay; she just made sure they made contact every year "and that he made some kind of a payment to me," the payments being "bigger in the beginning and . . . gradually [getting] smaller, down to two thousand the last time he made a payment." She also testified that David made some payments in "goods," entertaining her and her granddaughters at a restaurant in Seward and buying them "the most expensive wines," "[a]nd he worked on my boat quite a bit, bought a lot of stuff for my boat," such as a radar.

Anna testified at her deposition that she considered all these payments, "during that period of time until we settled," to be interest on what David owed her; she calculated that these interest payments eventually totaled about $30,000.

Anna also testified that she and David probably never would have had to place a value on the IFQs as long as David had "kept his agreement" — that is, as long as he had "kept paying me until I was ready to start my business." She testified that at the time of her deposition she was ready to start her own business, a film-making studio, and she needed $100,000 to do it; that she might need more money next year; and that David "would have been obliged to [keep] supporting me with my business, as far as I'm concerned," because the IFQs "put him way up there [as] king of the mountain." She testified that there was "no limit" on what she could ask David for under their agreement.

She also testified that since David had broken their agreement, what she wanted now was "the IFQs and . . . fifty percent of the money he's made with the IFQs so far."

Anna also described the parties' agreement in answers to interrogatories. She again acknowledged that "[t]here was no set agreed amount as it was impossible to set a [dollar] value on [the IFQs] at that time." She again described a promise by David that he would get her started "in any business [she] want[ed] that doesn't involve fishing," and in the meantime she should "just ask [whenever] [she] need[ed] money for something legitimate." However, "I always had to have a good reason for why I need[ed] the money[;] he didn't want me to spend any of it on something that wasn't a necessity." She attested that David would usually pay only about 75% of what she asked for. She described one incident in which she demanded that David pay $1,500 for the down payment on a friend's hospitalization in Seattle, "or else our agreement not to get lawyers involved was off."

When David moved for summary judgment on Anna's contract claim, Anna filed two affidavits in opposition: her own and one by Peggy Parker, president of a research firm with extensive experience in fisheries. In Anna's affidavit, she asserted that David "promised me that I would get my share of the IFQs earned by the F/V ARROW while I was married to him and working as a crew member"; she also characterized her agreement with David as that "I would get money as I needed it" and "that he would provide a significant payment toward his debt once I was ready to settle down or started another business as long as it wasn't fishing." In addition, she asserted that "[n]ow I'll be asking for some of the black cod IFQs since I paid for the gear that got the 'Arrow' started fishing black cod."[3] Parker, Anna's expert, calculated the value of

---

[3]    Anna had testified at her deposition that her agreement with David encompassed only halibut IFQs, not black cod IFQs.

Anna's marital share of the halibut IFQs on the assumptions that Anna's active fishing during one of the five base years represented 20% of the IFQ shares; that in the divorce she would have received half of those shares; and that she would then have fished those shares herself as an IFQ holder on a halibut vessel and received a 40% share of the recovery.

In Anna's answers to interrogatories, however, she took issue with the position of her expert as to the percentage of IFQs she was entitled to. Asserting that her "attorney worked it out to be 5%," she stated that "I personally feel that it should be closer to 10% in light of the way [David] forced me out of our marriage. . . . [I] still believe I should get 10% of the IFQs and 50% boat share of the money made using those [IFQs] since 1994 [plus] interest in the gold David bought with his extra money since [the IFQs] started."[4]

It is undisputed that beginning in the fall of 1995, David made a number of payments to Anna in varying amounts. The amount of the payments gradually decreased over time, until eventually David stopped making payments altogether and avoided further contact with his former wife.

In February 2011, Anna filed suit against David, alleging breach of contract and promissory estoppel. A year later she filed a motion under Alaska Civil Rule 60(b)(6), seeking to reopen the 1985 dissolution and allocate the IFQs as marital property. The superior court initially ruled that Anna's descriptions of the parties' contract were in many respects too indefinite and uncertain to be enforced, but her claim that David had promised her a marital share of the IFQs survived summary judgment

---

[4] The source of the 5% figure is unclear from the record. The calculations of Anna's expert, Parker, result in a 4% share (20% of David's total IFQ shares x .5 (Anna's marital share) x .4 (Anna's IFQ holder share)).

because the court could determine her marital share; it further ruled that although the statute of frauds applied, so did the full-performance exception to the statute of frauds. The superior court also ruled that promissory estoppel could apply to David's promise to pay Anna a share of the quotas. In a subsequent order, however, the superior court ruled that the IFQs were not marital, because David did not qualify for the IFQs until years after the marriage had been dissolved, and Anna's marital share of the IFQs was therefore zero. Accordingly, the superior court dismissed Anna's suit for breach of contract and denied her Rule 60(b)(6) motion to reopen the dissolution.

Anna appeals, arguing that a portion of the IFQs was marital property because she was married to and fished with David during one of the base years used to determine the IFQs' value. David cross-appeals, arguing that he has no contract with Anna, that any contract was barred by the statute of frauds, and that promissory estoppel does not apply to any promise he may have made.

## III. STANDARDS OF REVIEW

We recently clarified the standard of review for decisions whether to classify property as marital.

> The characterization of property as separate or marital may involve both legal and factual questions. Underlying factual findings as to the parties' intent, actions, and contributions to the marital estate are factual questions. Findings of fact are reviewed for clear error, but whether the trial court applied the correct legal rule in exercising its discretion is a question of law that we review de novo using our independent judgment.[5]

---

[5]     *Beals v. Beals*, 303 P.3d 453, 458-59 (Alaska 2013) (footnotes, internal quotation marks, and alterations omitted) (quoting *Odom v. Odom*, 141 P.3d 324, 330 (Alaska 2006); *Hanson v. Hanson*, 125 P.3d 299, 304 (Alaska 2005)).

We review motions for summary judgment de novo, affirming the superior court if the record presents no genuine issues of material fact and if the movant is entitled to judgment as a matter of law.[6] In making this assessment, we draw all reasonable inferences in favor of the non-moving party.[7] We review for abuse of discretion an order denying a Rule 60(b) motion.[8]

## IV. DISCUSSION

### A. With The Possible Exception Of An Agreement To Pay Anna Her Marital Share, The Alleged Contract Is Not Enforceable Because It Lacks Definite And Certain Terms.

In an action to enforce a contract, "Alaska plaintiffs must show: 'an offer encompassing all essential terms, unequivocal acceptance by the offeree, consideration, and an intent to be bound.' "[9] To be enforceable a contract must also "have reasonably definite and certain terms."[10] "The contract amount, in particular, must be definite and specific."[11] "The terms of a contract are reasonably certain if they provide a basis for

---

[6] *Beegan v. State, Dep't of Transp. & Pub. Facilities*, 195 P.3d 134, 138 (Alaska 2008).

[7] *Id.*

[8] *Frost v. Ayojiak*, 957 P.2d 1353, 1355 (Alaska 1998) (citing *Benedict v. Key Bank of Alaska*, 916 P.2d 489, 491 (Alaska 1996); *McCall v. Coats*, 777 P.2d 655, 657 (Alaska 1989)).

[9] *Magill v. Nelbro Packing Co.*, 43 P.3d 140, 142 (Alaska 2001) (quoting *Davis v. Dykman*, 938 P.2d 1002, 1006 (Alaska 1997)).

[10] *Madonna v. Tamarack Air, Ltd.*, 298 P.3d 875, 879 (Alaska 2013); *Stenehjem v. Kyn Jin Cho*, 631 P.2d 482, 485 (Alaska 1981).

[11] *Magill*, 43 P.3d at 142.

determining the existence of a breach and for giving an appropriate remedy."[12] Courts will fill in gaps where parties' reasonable expectations are clear, but they cannot impose performance where it is not clear the parties had a meeting of the minds.[13]

As explained above, the evidence Anna submitted described the parties' agreement in various ways, including (1) that David would pay Anna her marital share of the IFQs,[14] and (2) that in lieu of determining Anna's marital share, David would give Anna money upon reasonable request, including the money to set her up in business when she was ready, and he would continue to support her thereafter without limit as long as she did not "bring lawyers into our business."

The superior court carefully sifted through Anna's descriptions of the parties' agreement in its order denying summary judgment. The superior court concluded that Anna "has provided at least one description of her agreement with [David] that has sufficient definition for the Court to identify a breach and to craft a remedy," that agreement being "that [Anna] would receive her share of the [IFQs]." The other agreement described by Anna was essentially that David would pay indefinite sums of money for an indefinite time (but only if he agreed that the payments were necessary, and then not always in the amounts requested); the payments were either installments or interest payments on a principal amount that was itself undetermined. Any such agreement lacks the "reasonably definite and certain terms" necessary for contract

---

[12]     *Hall v. Add-Ventures, Ltd.*, 695 P.2d 1081, 1087 (Alaska 1985) (quoting *Stenehjem*, 631 P.2d at 485).

[13]     *Magill*, 43 P.3d at 142.

[14]     In her pleadings in the superior court, Anna also characterized the agreement as one for "her fair share"; she appears to equate this with her marital share.

formation,[15] including the contract amount,[16] and leaves the court without sufficient basis for determining whether the contract has been breached and, if so, how to formulate a remedy.[17]

Because there is no enforceable contract, we need not discuss the statute of frauds or its exceptions for part performance or full performance. Nor does promissory estoppel provide an alternate remedy; the doctrine requires an actual promise that "must be definitive, must be very clear, and must use precise language."[18] The "actual promise" necessary for the application of promissory estoppel "is 'analytically identical' to the acceptance of an offer in contract law."[19]

However, we agree with the superior court that a promise to pay the marital share of the IFQs — with the amount left to be determined — could ordinarily be definite enough to be enforced, since the law of marital property provides a basis for determining whether there is a breach and for creating an appropriate remedy.[20] But this is not an ordinary case, given that (1) Anna herself at times described a different contract,[21] (2) Anna's own testimony was in conflict over whether David's periodic payments over the

---

[15] *Madonna*, 298 P.3d at 879.

[16] *Magill*, 43 P.3d at 142.

[17] *See Hall*, 695 P.2d at 1087.

[18] *Alaska Trademark Shellfish, LLC v. State, Dep't of Fish & Game*, 172 P.3d 764, 767 (Alaska 2007) (internal footnote and quotation marks omitted).

[19] *Id.* (quoting *Brady v. State*, 965 P.2d 1, 6, 11 (Alaska 1998)).

[20] *See Hall*, 695 P.2d at 1087.

[21] For example, Anna testified at her deposition that she and David would never have had to value the IFQs if David had "kept paying me until I was ready to start my business."

course of 13 years were part of her marital share or only interest on that undetermined amount, and (3) Anna disagreed with the value of the marital share reached by her own expert.[22] Even so we do not need to decide whether Anna's contract claim to a marital share properly survived summary judgment. Like the superior court, we conclude that the IFQs were not marital; there was thus no marital share to which Anna could have been contractually entitled.

B.	**The IFQs Were Not Acquired During Marriage And Therefore Are Not Marital Property.**

We have held IFQs to be marital property and divided them between the divorcing parties on three previous occasions.[23] In *Ferguson v. Ferguson*, the parties married in 1988 and divorced in 1994; their marriage spanned all the qualifying years.[24] The parties in both *Johns v. Johns* and *McGee v. McGee* were married through all the base years and the qualifying years.[25] These cases are thus readily distinguished from this one. Anna and David's marriage had been dissolved for eight years before the IFQ program even began; the first qualifying year was not until three years after the dissolution.

---

[22]	Stating that her "attorney worked [her marital share] out to [be] 5%" (apparently in reference to her expert's calculations), Anna asserted in an interrogatory answer that "it should be closer to 10% in light of the way [David] forced me out of our marriage."

[23]	*Ferguson v. Ferguson*, 928 P.2d 597, 598 (Alaska 1996); *Johns v. Johns*, 945 P.2d 1222, 1224 (Alaska 1997); *McGee v. McGee*, 974 P.2d 983, 986 (Alaska 1999).

[24]	*Ferguson*, 928 P.2d at 598.

[25]	*See Johns*, 945 P.2d at 1224 (stating that parties "were married in September 1984, and separated in October 1993"); *McGee*, 974 P.2d at 986 (stating that parties "married in 1978" and "filed for dissolution in March 1993").

Determining whether property is marital begins with AS 25.24.160(a)(4). The statute authorizes courts to "provide . . . for the division between the parties of their property, including retirement benefits, whether joint or separate, *acquired only during marriage*" (emphasis added). "The invasion of post-marital acquisitions for purposes of property division is obviously not permitted by the statute."[26] And "the date for segregating marital from post-marital property is ordinarily the date of the functional termination of the marriage."[27] Thus, we may consider the IFQs at issue here to be marital only if they were "acquired" during Anna and David's marriage.

We have broadly interpreted the term "acquired" in order to accomplish the statutory goal that property division "fairly allocate the economic effect of divorce."[28] For example, although pension benefits might not be received until long after divorce, we deem them acquired during marriage to the extent the working spouse earns them during marriage;[29] we held in *Laing v. Laing* that this is so "regardless of whether they have vested" before divorce.[30] We adopted this rule because "[p]ension benefits are generally viewed as deferred compensation for services rendered and the employee

---

[26]    *Bandow v. Bandow*, 794 P.2d 1346, 1347 n.2 (Alaska 1990).

[27]    *Hanlon v. Hanlon*, 871 P.2d 229, 231 (Alaska 1994).

[28]    AS 25.24.160(a)(4) (stating that "the division of property must fairly allocate the economic effect of divorce by being based on consideration of" various listed factors).

[29]    *Schmitz v. Schmitz*, 88 P.3d 1116, 1129-30 (Alaska 2004) (citing *Edelman v. Edelman*, 3 P.3d 348, 356 (Alaska 2000)) (holding that the IRA in question was a marital asset subject to equitable division because it increased in value during the marriage). *See also Williams v. Crawford*, 982 P.2d 250, 254 (Alaska 1999) (holding that pensions earned during marriage are marital property subject to division upon divorce).

[30]    741 P.2d 649, 655 (Alaska 1987).

spouse's right thereto is a contractual right,"[31] and " '[t]he fact that a contractual right is contingent upon future events does not degrade that right to an expectancy.' "[32] In short, under *Laing*, the contingent contractual right to a future benefit is sufficient basis on which to conclude that the benefit is "acquired" during marriage and is therefore marital.

It is undisputed in this case that the parties, during their marriage, lacked even the "expectancy" of a future benefit related to the IFQs. Anna acknowledged in the superior court that at the time of divorce the fishing business "had an uncertain[] but limited value"; she asserted in her affidavit that David assured her of her fair share "if IFQs ever happened." This uncertainty and speculation fall far short of an "expectancy," let alone the contingent contractual right that we held in *Laing* was sufficient to show that a future benefit was "acquired . . . during marriage."

In *Winther v. Samuelson*, we interpreted *McGee* and *Johns* to mean that "[quota] shares should be considered marital property to the extent that the [quota] *entitlement* was earned during the marriage."[33] This is consistent with our pension cases;[34] it is also consistent with *Ferguson*, where the IFQ was acquired during a marriage that spanned the qualifying years, and this court looked to the husband's premarital labor during the base years to determine whether a portion of the IFQ was his

---

[31]    *Id.* at 656 (citing *Johnson v. Johnson*, 638 P.2d 705, 708 (Ariz. 1981) and *In re Marriage of Brown*, 544 P.2d 561, 567 n.8 (Cal. 1976)).

[32]    *Id.* at 656 (quoting *Brown*, 544 P.2d at 566 n.8 (Cal. 1976)).

[33]    10 P.3d 1167, 1171 (Alaska 2000) (emphasis added).

[34]    *See Conner v. Conner*, 68 P.3d 1232, 1235 (Alaska 2003) ("[R]etirement benefits earned during the marriage are marital property subject to equitable division.").

separate property.[35]  The claim in *Ferguson* — that premarital work enhanced the value of an asset that was plainly earned during the marriage — is unlike the claim here:  that marital work enhanced the value of an asset that did not even come into existence until years after the marriage was over.[36]

Anna contends that it is unfairly restrictive for the court to consider only the qualifying years in determining whether the IFQs are marital, since it is undisputed that marital labor during one of the base years did add to the asset's value once the asset came into being.  We have recognized that property acquired outside of marriage can become marital property to the extent marital efforts contribute to its value.[37]  But cases applying this principle address premarital property brought into the marriage or separate property acquired during marriage; they do not address property that did not even exist during marriage, even in the sense of a contract right to someday receive it.[38]  We have never held that property acquired *after divorce* may become marital if, in retrospect, it can be seen to have more value than it would have had absent the marriage, and AS 25.24.160(a)(4) does not allow it.  Practically speaking, there are few acquisitions and achievements in life that cannot be traced to life's earlier stages.  Every advancement, bonus, and business success is founded on a personal history that may well include marriage and divorce.  But if at the time of divorce the parties can only speculate that certain property might come to exist in the future, with not even a contingent

---

[35]     *See Ferguson v. Ferguson*, 928 P.2d 597, 600 (Alaska 1996) (holding that a fishing quota is marital property to the extent that "the size of the quota share" is attributable to labor performed during the marriage).

[36]     *Id.*

[37]     *Harrower v. Harrower*, 71 P.3d 854, 858 (Alaska 2003).

[38]     *See id.*

contractual right to ensure that it does, such property was not "acquired . . . during marriage." We would do a major disservice to the express statutory language if we were to hold that such property was marital.[39]

The dissent argues that our decision today "ignor[es] the definition of 'acquisition' adopted in almost all equitable distribution states," i.e., "that property is acquired whenever contributions create real value, and not only at the moment when legal title passes."[40] But if the dissent's understanding of the general definition were correct, one would expect to find case law from other equitable distribution states holding that property not existing yet at the time of divorce — even in the inchoate sense of a contract right or expectancy — was nonetheless marital. Our decision is consistent with the majority definition as we understand it. The "real value" at issue in this case is the value Anna's work added to the value of the IFQ shares; that value was not created until the IFQ program came into existence, eight years after the marriage ended.

---

[39] For example, if a spouse holds an interest in intellectual property at the time of divorce, future royalties flowing from that property are marital "so long as such proceeds . . . are neither 'indefinite nor speculative.' " *Lynch v. Lynch*, 43 A.3d 667, 675 (Conn. App. 2012) (holding that where an author during marriage secured "a contractual right to royalties from the sale of his book," the royalties were marital property subject to division); *In re Marriage of Heinze*, 631 N.E.2d 728, 731 (Ill. App. 1994) (holding that where "the book royalty contracts were executed by petitioner and [her publisher] during the marriage" and future royalties were not "unproven or speculative," the royalties were "analogous to pension payments to be made in the future" and "should have been classified as marital property"). Similarly, "[c]ourts have generally held that the mere possibility of a future inheritance or gift does not constitute divisible property"; "[t]he lack of a legally enforceable right distinguishes future inheritances and gifts from other contingent assets such as unvested pensions, where the owning spouse has a presently existing legal right." 2 BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 6.91, at 476 (3rd ed. 2005) (emphasis omitted).

[40] Dissent at 24 (quoting TURNER, *supra* note 39, § 5.21, at 345).

**C.** **The Superior Court Did Not Err In Denying Anna's Civil Rule 60(b)(6) Motion.**

We held in *McGee* that a motion to reopen a property division and allocate IFQs was properly brought under Civil Rule 60(b)(6).[41] We reasoned that the creation of the IFQ program in 1993 was the type of "extraordinary circumstance" contemplated by Rule 60(b)(6) because the couple "did not address or anticipate" the program when dividing their property.[42] But since the quotas here are not marital property, there is no justification for reopening Anna and David's 1985 dissolution. The superior court did not err in denying the Rule 60(b)(6) motion.

**V.** **CONCLUSION**

The judgment of the superior court is AFFIRMED.

---

[41] *McGee v. McGee*, 974 P.2d 983, 990 (Alaska 1999).

[42] *Id.*

FABE, Chief Justice, with whom BOLGER, Justice, joins, dissenting.

I agree with the court that the only potentially enforceable promise made by David Kelly was his promise to pay Anna Young her marital share of the IFQs.[1] The court avoids deciding whether that promise included sufficiently definite and certain terms to be enforceable because it concludes that there was no marital share of the IFQs to divide.[2] It is with that latter conclusion that I disagree.

When Anna and David fished together on the F/V ARROW in 1984, they were married. The product of their labor in that year was indisputably marital property.[3] Yet the court concludes that the IFQs at issue here belong entirely to David, despite the fact that the IFQs' value increased — and increased directly and measurably — as a result of marital labor.

This unfair result is inconsistent with the explicit purpose of the applicable statute, is not required by our prior decisions, and runs counter to the principles of equitable distribution. In my view, because marital labor increased the value of the IFQs, Anna is entitled to her marital share of that increase in value, even if the IFQs are not themselves marital property.

---

[1]    Op. at 9-11.

[2]    *Id.* at 11-15.

[3]    *See Schmitz v. Schmitz*, 88 P.3d 1116, 1125 (Alaska 2004) ("Marital property includes all property acquired during the marriage, excepting only inherited property and property acquired with separate property which is kept as separate property." (internal quotation marks and citation omitted)); *see also Lewis v. Lewis*, 785 P.2d 550, 558 (Alaska 1990).

### A. The Explicit Purpose Of AS 25.24.160 Is Equitable Distribution.

Alaska Statute 25.24.160(a)(4) instructs that when a court distributes property after a married couple parts ways, "the division of property must fairly allocate the economic effect of divorce." I acknowledge that the statute also instructs courts to divide "property . . . acquired only during marriage," but we must understand that language in the context of the legislature's clear statement of the statute's purpose.[4] Fairness was the legislature's intent, and that goal must be our guide. Equitable distribution of property is no vague policy concern conjured up to avoid unappealing results in particular cases; rather, it is an explicit statutory command that the legislature has indicated must drive our analysis in all cases.[5]

The circumstances of the present case are unusual in that the property at issue was not formally acquired while the parties were married, nor was it acquired by one of the parties before marriage. Instead, it was formally acquired after the marriage was over, but the extent of the property was partly determined by contributions of labor during the marriage. The legislature could not easily have anticipated these unusual circumstances.

---

[4] AS 25.24.160(a)(4).

[5] For example, the legislature has recognized that in order to achieve a fair division of property, it may be necessary for the court to "invade the property . . . of either spouse acquired before marriage when the balancing of the equities between the parties requires it." *Id.* In creating such a significant exception, the legislature has expressed its policy that in dividing property during a divorce proceeding, fairness should prevail over formalism.

**B.** **We Have Previously Interpreted The Phrase "Acquired During Marriage" Broadly When Necessary To Fulfill The Statutory Mandate Of Equitable Distribution.**

As the court acknowledges, in our prior cases we have emphasized equitable distribution over a strict interpretation of the phrase "acquired . . . during marriage."[6] In particular, our prior decisions relating to pensions, and our application of active appreciation analysis to pre-marital assets, favor the conclusion here that Anna is entitled to compensation for the increase in the value of the IFQs attributable to marital labor in 1984.

In our decisions addressing equitable distribution of pension benefits, we have repeatedly interpreted AS 25.24.160(a)(4) as permitting the conclusion that an ex-spouse is entitled to a share of the marital portion of an employee-spouse's retirement benefits, to the extent that the employee-spouse earned those benefits during marriage.[7] We have held that pension benefits earned for labor performed during marriage may be deemed "acquired . . . during marriage" even if they vest after divorce.[8] The court tries to distinguish nonvested pension benefits from the IFQs at issue here, noting our observation in *Laing v. Laing* that "[p]ension benefits are generally viewed as deferred compensation for services rendered and the employee spouse's right thereto is a contractual right."[9] The court also concludes that Anna is ineligible for a marital share

---

[6]     Op. at 12.

[7]     *See, e.g.*, *Schmitz*, 88 P.3d at 1129-30; *Williams v. Crawford*, 982 P.2d 250, 254 (Alaska 1999).

[8]     *Laing v. Laing*, 741 P.2d 649, 656 (Alaska 1987).

[9]     Op. at 12-13 (alteration in original) (quoting *Laing*, 741 P.2d at 656).

because while nonvested pension benefits constitute a contractual (even if contingent) right, the parties in this case lacked even an "expectancy" in the IFQs.[10]

But why is it significant that nonvested pension benefits are viewed as deferred compensation? It may be more obvious that an ex-spouse is entitled to the deferred compensation of the other spouse because a salary is clearly marital property,[11] but the claim in this case is not really so different. The underlying reason that deferred compensation is treated as marital property is that the product of labor during marriage is marital property.[12] And this reason supports the conclusion that IFQs are marital property to the extent their value was determined by marital labor. Here, while the IFQs themselves are not compensation for marital labor, there is no question that their size was determined by labor in the base years, including the marital labor in 1984.

We did remark in *Laing* on the contractual nature of nonvested pension benefits,[13] and as the court notes, the present existence of a legal right may help distinguish property subject to distribution from things of value that should not be so distributed.[14] But we did not say in *Laing* that a contractual right was *necessary* to show

---

[10]    *Id.* at 13.

[11]    *See Schmitz*, 88 P.3d at 1124 ("Assets acquired during marriage . . . — most commonly salaries earned by either spouse during marriage — are considered marital assets" (quoting BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.23, at 263 (2d ed.1994)).

[12]    *See* 1 BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.22, at 356 (3rd ed. 2005) (noting that "the primary reason for treat[ing a pension] as marital property is . . . that the benefit is commonly awarded to employees as actual compensation for marital efforts").

[13]    *Laing*, 741 P.2d at 656.

[14]    Op. at 15 n.39.

that a future benefit was "acquired . . . during marriage"; we merely concluded that in that case it was *sufficient*.[15]

And we also indicated in *Laing* that our focus was a fair distribution of assets under AS 25.24.160(a)(4). In reaching our conclusion in *Laing* that nonvested pensions could be marital assets, we explained that regardless of the label placed on the employee-spouse's interest — "a mere expectancy, or a contingent future interest" — "[t]he non-employee spouse's contribution to the pension asset is exactly the same."[16] The formal designation of the asset was relevant in that case to address whether the contingent nature of the right made it too speculative to be considered marital property.[17] But we indicated that allowing "the contingencies that may prevent the employee spouse from ever collecting his or her nonvested pension . . . [to] bar the non-employee spouse from recovering a share if the pension is in fact paid out . . . would frustrate the statutory command that Alaska courts effect a 'just division of the marital assets.' "[18] Emphasizing the legislature's intent to favor equitable distribution, we noted that "[i]t would be wholly inconsistent with this policy to ignore the existence of so substantial an

---

[15] *Laing*, 741 P.2d at 655-56.

[16] *Id.* (italics removed) (quoting LAWRENCE J. GOLDEN, EQUITABLE DISTRIBUTION OF PROPERTY 172 (1983)).

[17] *Id.* at 655.

[18] *Id.* at 656 (quoting AS 25.24.160(a)(4)). As we noted in *Laing*, at least at the time of that decision many jurisdictions considered nonvested pensions "too speculative" to treat them as property subject to equitable distribution at divorce. *Id.* at 655. Yet we rejected that view, noting that the potentially speculative nature of the pension rights has no bearing on the non-employee spouse's rights vis-à-vis the employee. *Id.* at 656.

asset as a party's pension rights."[19]   And we reached that conclusion in *Laing* even though there was still uncertainty at the time of the divorce proceeding as to whether the asset would materialize.[20]   Here there is no uncertainty at all — the asset now exists — and the statutory command of equitable distribution remains unchanged.

Our precedents applying active appreciation analysis are also relevant here.[21]   In a nod to our decisions in this area, the court acknowledges that property acquired outside of marriage can become marital to the extent that marital efforts increase its value.[22]   As we explained in *Hanson v. Hanson*, under active appreciation analysis "the asset's value at the inception of the marriage retains its separate character, but any subsequent increase in value is treated as marital property to the extent that it results from active marital conduct."[23]

The court stresses that our decisions applying active appreciation analysis "address premarital property brought into the marriage or separate property acquired during marriage" rather than "property [like the IFQs here] that did not even exist during

---

[19]   *Id.*

[20]   *Id.*

[21]   *See Hanson v. Hanson*, 125 P.3d 299, 305 (Alaska 2005) (applying active appreciation analysis and characterizing as marital property the increase in value of business attributable to husband's marital labor); *Harrower v. Harrower*, 71 P.3d 854, 860 (Alaska 2003) (remanding to trial court for active appreciation analysis); *Martin v. Martin*, 52 P.3d 724, 727 (Alaska 2002) (explaining and approving the doctrine); *Lowdermilk v. Lowdermilk*, 825 P.2d 874, 877 (Alaska 1992) (explaining that "[t]he time and energy of both spouses during the marriage is to be considered in dividing marital property").

[22]   Op. at 14 (citing *Harrower*, 71 P.3d at 858).

[23]   125 P.3d at 304 (quoting *Harrower*, 71 P.3d at 858).

marriage."[24] The court interprets our decisions as permitting characterization of IFQs as marital only if the "entitlement was earned during marriage" or the "asset . . . was plainly earned during the marriage."[25] I recognize that in the typical active appreciation scenario the separate asset exists before it appreciates in value due to a marital contribution, and I do not suggest we should apply that analysis unaltered to the present case. But our active appreciation analysis decisions establish that increases in asset value attributable to marital labor should be treated as marital property, even if the asset itself remains the separate property of the other spouse. And active appreciation analysis counsels against giving undue consideration to formal designations, as our overarching approach has been — and must be — equitable distribution and fairness to the parties whose marital contributions have increased the value of an asset. Thus under active appreciation analysis, the disputed IFQs should remain David's separate property, but Anna should be entitled to her marital share of the increase attributable to the couple's labor in 1984.

Our decisions relating to pensions and our decisions applying active appreciation analysis demonstrate that we have frequently used a broad definition of the phrase "acquired . . . during marriage" in carrying out the legislature's instruction to divide property in a way that "fairly allocate[s] the economic effect of divorce."[26] There are good reasons to continue to do so. As one commentator has explained, "substantial disparities often exist between the legal title to an asset and the contributions made to obtain it."[27] To address that disparity, courts in many equitable distribution states have

---

[24] Op. at 14.

[25] *Id.* (emphasis removed).

[26] AS 25.24.160(a)(4).

[27] TURNER, *supra* note 12, § 5.21, at 344. The typical factual situation in which this concern arises is one in which the economic value of an asset accrues after

(continued...)

concluded that "the . . . definition of acquisition must be entirely independent of legal title."[28] Defining "acquisition" in a way that provides for fairer outcomes, "[e]quitable distribution states have almost uniformly held that property is acquired whenever contributions create real value, and not only at the moment when legal title passes."[29]

Here, labor during the base years fed directly into the value of the IFQs. Moreover, in the IFQ context we have previously held that labor during the base years should have some bearing on the determination of a marital share in IFQs.[30] Our decision in *Ferguson v. Ferguson* indicated that labor during the base years — which can only affect the *size* of the entitlement, not *whether* it is granted — must have some bearing on how the quotas are characterized.[31] In concluding that Anna cannot be entitled to any of that value, the court loses sight of the principle behind *Ferguson*. And by ignoring the definition of "acquisition" adopted in almost all equitable distribution states, the court makes an unduly strong distinction between the qualifying years (which led to the passing of legal title) and the base years (which contributed real value to the IFQs).

---

[27](...continued) legal title is taken, for instance in the case of a purchase of real property, with title passing at the time of purchase and mortgage payments building equity over time. *See id.* at 339.

[28]    *Id.* at 344 (italics removed).

[29]    *Id.* at 345 (italics removed).

[30]    *See Ferguson v. Ferguson*, 928 P.2d 597, 600 (Alaska 1996) (concluding that proportion of marital to separate property in IFQ depended on extent to which value was determined by marital labor).

[31]    *Id.*; *see also* TURNER, *supra* note 12, § 5.22, at 377 (interpreting our decision in *Ferguson* to mean that "the proportion [of marital to separate property] must be based on the period used in determining value, and not the period used in determining entitlement").

The court reasons that if my understanding of "acquisition" were correct, "one would expect to find case law from other equitable distribution states holding that property not yet existing at the time of divorce . . . was nonetheless marital."[32] But the court should not take much solace in the fact that no other jurisdiction has yet dealt with the very unusual factual situation of this case involving IFQs. And the court identifies no decisions within an IFQ or other fishery management context in which any jurisdiction, faced with the novel issue of timing presented here, has taken the position the court now adopts.

The IFQs at issue here are a property right with identifiable dimensions and a definite market value: They entitle David to harvest up to a certain amount of halibut each year, or to sell that right to someone else.[33] If David and Anna had not fished in 1984, David presumably would have substituted the F/V ARROW's next-best year when he applied for IFQs, and he would likely have received some smaller entitlement. But David and Anna did fish in 1984, putting their labor — marital labor — into the fishing enterprise. The IFQs David actually received are partly the product of that labor; their increased value can be specifically and precisely traced to the fish that Anna and David caught in 1984. The argument that their labor in that year did not create real value is belied by the inclusion of the 1984 catch, rather than some other year's catch, as a base year in the formula used in calculating the size of the IFQs. If that cold mathematical formula comprehends that marital labor in 1984 created real value, then surely we should too.

---

[32]     Op. at 15.

[33]     *See Individual Fishing Quota (IFQ) Program*, ALASKAFISHERIES.NOAA.GOV, http://alaskafisheries.noaa.gov/ram/ifq.htm (last visited August 5, 2014).

- 25 -                                        **6944**

I would therefore reverse the superior court with respect to its dismissal of Anna's suit for failure to state a claim and its denial of her petition to reopen the dissolution.[34]

---

[34] However, contrary to Anna's assertion, she is not entitled to half of a 20% share of the IFQs. Marital labor in 1984 increased the value of the IFQs that David received by some proportion. Anna should be entitled to half the value of that increase, that is, half the difference between the value of the IFQs that David actually received and the value of the IFQs David would have received if he had used a non-marital year, rather than 1984, as one of his base years.